[Crim. No. 11871.   Second Dist., Div. One.   May 15, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM SOSA et al., Defendants and Appellants.

Caryl Warner, under appointment by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Stanton Price, Deputy Attorney General, for Plaintiff and Respondent.

WOOD, P. J.—In a jury trial defendants were found guilty of murder of the first degree. They waived jury trial on the penalty issue, and in the trial on that issue the penalty as to each defendant was fixed at life imprisonment. Each defendant appeals from the judgment against him. Defendant Sosa appeals also from the order denying his motion for a new trial.

Appellants contend that the court erred in receiving evidence of statements made by them to police officers in that (1) neither defendant was effectively advised of his rights, or waived such rights, before making the statements, and the statements therefore should have been excluded under the rules in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and (2) the statements of each defendant incriminated the other defendant, and should have been excluded, or defendants should have been tried separately, under the rules in *People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]. Appellant Lisboa contends that the evidence is insufficient to support the verdict finding him guilty of first degree murder. Appellant Sosa claims that he was inadequately represented by counsel (public defender). Both appellants further contend that the Court of Appeal should have appointed separate counsel to represent them on this appeal.

During a period of approximately two weeks prior to April 2, 1965, defendants resided in a room on the fourth floor of a hotel at 1249 South Grand Avenue in Los Angeles. Mrs. Rivera had lived at the hotel approximately five years, and

during April 1965 she occupied a room on the fourth floor of the hotel. She knew that defendants resided in the hotel, and she had become well acquainted with Thomas Takada (victim), 80 years of age, who had resided at the hotel more than five years and was known to the hotel occupants as Papa Takada. His room, which was also on the fourth floor, was separated from Mrs. Rivera's room by an elevator shaft. About 4 a.m. on April 2, 1965, Mr. Takada was murdered in his room.

Mrs. Rivera testified that on April 2, 1965, about 3:30 a.m., while she was in her room watching television, she heard Mr. Takada's door open and heard him walk to a bathroom across the hall from his room. A few minutes later she heard Mr. Takada "exclaim a shout of surprise." About a minute later, when she heard someone call, "Help," she went into the hall and to the door of Mr. Takada's room where she heard voices within the room. She listened and heard two men talking very low. One man said, "Let me do it next time." After she had listened for approximately 35 seconds, she noticed "a crack in the door," which was an opening of approximately two inches. She looked through the crack and saw Mr. Takada lying on the bed. He was "all bloodied" and appeared to be unconscious or dead. She looked at him for a few seconds and saw that he was breathing. She thought she should get an ambulance, and as she started to leave, the door "flew open" and defendant Lisboa "started out the door." She looked into the room and saw defendant Sosa standing near the bed upon which Mr. Takada was lying. Sosa had a lead pipe, about 3 feet long, in his hands, and he struck Mr. Takada severely several times, as though he (Sosa) were "chopping wood." She shouted, "What are you doing?" and then she ran for help—to a room on the third floor where the janitor (Victor Ramirez) lived. She and Victor ran upstairs toward the fourth floor. During that time they heard a door slam and heard running footsteps of other persons. The door to Mr. Takada's room was locked. Victor knocked on the door, but there was no response. They went in the elevator to the lobby, and saw defendant Sosa sitting there with Caldera and Cruz (who resided in the room with the defendants). She telephoned for the police and for an ambulance, and police officers (Cynar, Matheny, and Schmidt) arrived a few minutes later. She accompanied the officers upstairs, and the officers broke into Mr. Takada's room. He was on the bed, and the bed and walls were "bloodied." A lead pipe, which she

had seen in a corridor of the hotel during a period of several days, was in the room. After telling the officers what she had seen, she identified defendant Sosa as the person who had "wielded the bludgeon." She told the officers that she had not seen Cruz or Caldera in the room.

Officer Schmidt testified that when he arrived at the hotel, Sosa, Caldera, and Cruz were sitting in the lobby. He talked to them a few minutes, and then went to the fourth floor with Officer Cynar and Mrs. Rivera. He "kicked in" the door of Mr. Takada's room, and saw him lying on the bed. There was blood "all over the bed, the wall, and the floor." He called for an ambulance and a fingerprint expert. He went downstairs and examined the clothes, hands and shoes of Sosa, Caldera and Cruz. On Sosa's left hand there was a substance which appeared to be "dried blood." He arrested Sosa, Caldera and Cruz, and "advised them of their rights,"—he advised them in English, since Sosa had spoken to him in English.

The testimony of Officer Cynar was similar to the testimony of Officer Schmidt. Officer Matheny testified, among other things, that the officers found the pipe lying against the bed. (The pipe, which was about 3 feet in length and 2 inches in diameter, was received in evidence.) Officer Claborn, who is a fingerprint expert, arrived at the hotel about 4:40 a.m. (April 2). He testified that, in his opinion, a fingerprint taken from the door of Mr. Takada's room and appearing on Exhibit 7 was made by the same person who made the "Right ring" fingerprint appearing on Exhibit 6, which exhibit is the exemplar of defendant Sosa's fingerprints. He also testified that he "dusted" the pipe for fingerprints, but it had a considerable amount of blood on it, and he could not find any print thereon.

Officer Sandoval testified that he searched Mr. Takada's room and could not find his wallet, keys, or any money. (Mrs. Rivera had testified that Mr. Takada normally carried a wallet and "always had his keys.")

Mr. Takada died about 12 days after he had been beaten. An autopsy surgeon testified that Mr. Takada died "as a result of a fractured skull, with cerebral contusion and hemorrhage," and that broken bones in other parts of his body (collar bone and arm) contributed to his death. In the surgeon's opinion, the skull fracture and broken bones were caused by "blunt force or mechanical impact," and that an

iron pipe would be an "appropriate means" to inflict such injuries.

Victor Caldera, called as a witness by the People, testified that he and Cruz had been drinking on the evening of April 1, and had gone to the Saddle Rock Bar, where they met Sosa and Lisboa. About 2 a.m. (April 2) they (Caldera, Cruz, Sosa, and Lisboa) left the bar and went to the hotel. He and Cruz stayed in the lobby and talked, and Sosa and Lisboa went upstairs. About 15 minutes later Sosa and Lisboa returned, and Sosa sat in the lobby, and Lisboa left the hotel. A lady then came into the lobby and made a telephone call to the police, and the police came to the hotel. He (Caldera) stayed in the lobby "all the time" talking to Cruz.

Defendant Sosa testified that he lived at the hotel approximately two weeks prior to April 2, and he shared a room there with Lisboa, Cruz, and other persons. He went to the Saddle Rock Bar about 10:30 p.m. on April 1, and met Lisboa, Caldera, and a man named Indio at the bar. They drank beer until the bar closed at 2 a.m., and then went to a cafeteria where they met Cruz. The other men left the cafeteria and he stayed there approximately half an hour, and then went to the hotel. When he arrived there, he sat in the lobby with Cruz and Caldera. About five or ten minutes after he arrived there, he saw Lisboa pass through the lobby. He (Sosa) stayed in the lobby and talked to Caldera and Cruz. About 25 minutes after he was in the lobby, the police came in and arrested him. He had not gone upstairs during that time, he did not kill Mr. Takada, and knew nothing about the killing. He had returned to the hotel earlier in the evening before going to the Saddle Rock Bar, and it was possible that his hand might have touched the door of Mr. Takada's room as he went by there on the way to his own room. He could not recall whether he had blood on his hands when he was arrested, but his nose bleeds sometimes and it was possible that blood was on his hands.

On cross-examination by the deputy district attorney, Sosa said: He had a conversation with Officers Sandoval and Alexander at the police station about 6:35 p.m. on April 2. The officers did not say anything about his constitutional rights. He told the officers that he had been drinking at the Saddle Rock Bar with Caldera, Lisboa, and Indio, and they had gone to the cafeteria and met Cruz; he then returned to the hotel and stayed in the lobby until he was arrested; and he never went upstairs. He did not tell the officers that "I

have never been in that old man's room and I have never been closer to his door than from here to that door [approximately six feet]." He also testified that he signed a written statement which was read to him after he signed it.

Defendant Lisboa testified as follows: He came to Los Angeles in January 1965 and moved into the hotel room with Cruz. About 15 days later, Sosa moved into the room with them. About three days prior to April 1, Sosa had suggested that they rob Mr. Takada, and he had said, "No." About 11 p.m. on April 1, he went to the Saddle Rock Bar where he met Sosa and Caldera. After leaving the bar about 2 a.m., they went to a cafeteria where they met Cruz, and then went to the hotel. While they were walking toward the hotel, Sosa again asked him whether he wanted to help Sosa rob Mr. Takada, and he replied, "No." Sosa said that he did not have any money, and it "was the time that he had the opportunity to do it." He (Lisboa) had money, did not owe any money, and his rent was paid. They arrived at the hotel about 3 a.m. and he (Lisboa) went up to his room. He got his sweater and, about three minutes later, came from his room to take the elevator downstairs. While he was waiting for the elevator, he heard a noise coming from Mr. Takada's room. The door to the room was open and he could see Sosa hitting the old man with a lead pipe. When Sosa saw him (Lisboa), Sosa dropped the pipe, grabbed the old man by the neck, and struck the old man with a screwdriver. The old man was bleeding, and he told Sosa "not to do that." Sosa said that he did not care, he wanted the money. He turned to leave and Mrs. Rivera came out of her room. She asked him what happened, and he told her that Sosa was hitting the old man. He then went downstairs to the lobby where Cruz and Caldera were sitting and told them that Sosa was hitting the old man. He then left the hotel and went to a restaurant. He came back to the hotel about 7:30 a.m., but his room was closed so he left the hotel and never returned there although his rent was paid until Friday. Three days later he met Cruz who told him that the police were looking for him. He was arrested on April 15.

On cross-examination, defendant Lisboa was asked whether he had a conversation with Officer Alexander on April 16, 1965. He replied affirmatively and testified that the conversation was in English and that he had signed a written document after it had been read to him, but he did not understand what was read to him because he "didn't know any English." He testified that he made the following statements to

Officer Alexander in English: He had been drinking with Sosa at the bar; they left the bar about 2 a.m. and met Cruz at a restaurant; at the hotel Sosa said that "he was going into the old man's room and see if he had any money"; Sosa also said that "he was going to break into his [Takada's] room, because the old man had money, and also canned food to eat."; he (Lisboa) heard someone breaking the door down and later saw Sosa in the room hitting the old man; and he saw blood on the bed. He testified that he did not remember making the following statements to the officer: "Willie told me he was going in the old man's room to see if he had any money. Willie [Sosa] and me went upstairs to the fourth floor. When Willie and me got to the fourth floor, he said he was going into the old man's room right now, so I told him to go ahead, and I went to the rest room across the hall. He [Sosa] had told us of his plan the first day he came to live with us, and he mentioned this many times."

Officer Alexander, who was called by the People in rebuttal, testified in part as follows: On April 16 he had a conversation in English with Lisboa, and at that time another officer (Ramirez) was present. The officers could speak Spanish fluently. Lisboa seemed to speak English quite well. He told Lisboa that he had a right to remain silent if he chose to do so; that he did not have to make a statement; that he had the right to counsel, or an attorney; and that anything he might say might be used against him in a subsequent criminal proceeding. Thereafter, Lisboa made statements in English. (Included therein were the statements which, in his testimony, he said he could not remember having made.) The statements were recorded in writing "one or two sentences at a time," and Lisboa was asked whether these sentences were correct. The questioning proceeded in that manner for approximately 20 minutes, and then the "entire document" was read to Lisboa in English and he signed it. In his (officer's) opinion, Lisboa spoke English well enough to understand what was being said, but Lisboa had difficulty understanding the word "lawyer," and the word "attorney." After Lisboa made the statements, he was told the Spanish word for "attorney" is "abogado," and then his "rights" were explained in Spanish. In his (officer's) opinion, Lisboa thoroughly understood the contents of the document when he signed it, but, although Lisboa had said he understood the advice with reference to his rights, he (officer) "was not sure he had understood the rights even in Spanish."

Officer Alexander also testified that he had a conversation in English with defendant Sosa on April 2. He advised Sosa that "he could remain silent if he wished; that he had the right to counsel, an attorney to be present; and that anything he might say might be used against him in any subsequent criminal proceedings." Sosa then made statements which included the statement, "I have never been in that old man's room and I have never been closer to his door than from here to that door [approximately six feet]."

Appellants contend that the court erred in receiving evidence of statements made by them to police officers in that neither defendant was effectively advised of his rights, or waived such rights, before making the statements; and the statements therefore should be excluded under the rules in *Escobedo* v. *Illinois, supra,* and *Miranda* v. *Arizona, supra.*

In support of appellant Sosa's contention that his statements were inadmissible against him, he asserts that, because he was a young uneducated Puerto Rican farm boy (24 years of age), the advice given to him in English with reference to his rights (under *Escobedo* and *Miranda*) was ineffective and he did not waive those rights. He also asserts that the "fact that such statements were used by way of impeachment does not nullify the prejudice."

The trial in the present case was in September 1965, and the *Miranda* rules are not applicable herein. (See *People* v. *Rollins,* 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].) Prior to making the statements, Sosa was advised that he could remain silent if he wished; that he had the right to have an attorney present; and that anything he might say might be used against him in subsequent criminal proceedings. Such advice was sufficient under the *Escobedo* rules. (See *People* v. *Lookadoo,* 66 Cal.2d 307, 318-319 [57 Cal.Rptr. 608, 425 P.2d 208].) Sosa's statements were to the effect that he had never been in Mr. Takada's room. The record also shows that Sosa, who testified in English, conversed fluently with the officers in English. "It is clear that the question of whether or not there had been a waiver is primarily a question for the trial judge and his determination thereon should not be disturbed by a reviewing court unless it is palpably erroneous." (*People* v. *Stafford,* 240 Cal.App.2d 422, 424 [49 Cal.Rptr. 598]; see *People* v. *Salcido,* 246 Cal.App.2d 450, 453-454 [54 Cal.Rptr. 820].) Thus, although the statements apparently were used only to impeach the credibility of Sosa's testimony on collateral matters by showing

18

his prior inconsistent statements (see *People* v. *Davis,* 241 Cal.App2d 51, 54 [50 Cal.Rptr. 215]), the statements would have been admissible during the People's case in chief. Sosa's statements were admissible against Sosa.

█ In support of Lisboa's contention that his statements were inadmissible against him, he asserts that he was an uneducated Puerto Rican farm boy who did not speak English, the advice given to him in English was ineffective, and he did not waive his rights under the *Escobedo* and *Miranda* rules.

Prior to making the statements, in English, to the officers, Lisboa was advised (in English) that he had a right to remain silent if he chose to do so; that he did not have to make a statement; that he had the right to counsel, or an attorney; and that anything he might say might be used against him in subsequent criminal proceedings. Officer Alexander testified that he had given the advice in English, and had conversed with Lisboa in English, because he had talked with Lisboa before and Lisboa appeared to understand English well. The statements were made in English within a period of approximately 20 minutes and the officer recorded the statements in writing a few sentences at a time, and read those sentences to Lisboa in order that Lisboa might make corrections, before proceeding to record other statements. The statements, with a few exceptions, are similar to Lisboa's testimony at the trial, namely, that he had not participated with Sosa in the killing of Mr. Takada. Although Lisboa testified with the aid of an interpreter, the officer testified that he had no doubt that Lisboa understood all of the statements which he made. The officer also testified that he was "not sure" that Lisboa understood the meaning of the word "lawyer" or the word "attorney." Lisboa's statements were used in evidence to impeach the credibility of his testimony that he had gone upstairs to his room alone and had not accompanied Sosa upstairs. The trial herein was prior to the decision in *Miranda,* and the advice given to Lisboa prior to his making the statements sufficiently informed him of his rights as those rights are defined in *Escobedo.* Whether Lisboa understood and waived those rights were questions of fact. Lisboa's statements were admissible against Lisboa.

█ Appellants also contend that the statements of each defendant incriminated the other defendant, and should have been excluded, or defendants should have been tried separately, under the rules in *People* v. *Aranda, supra.*

In *People* v. *Charles*, 66 Cal.2d 330, 332 [57 Cal.Rptr. 745, 425 P.2d 545], it was held that the rules in Aranda "are available to defendants whose judgments of conviction are still on appeal even though tried before the date of the *Aranda* decision, November 12, 1965."

In *Aranda, supra*, (63 Cal.2d 518), where a confession by Martinez was received in evidence in a joint trial of Martinez and Aranda with instructions that the jury should consider the confession as evidence against Martinez only, it was held (p. 523) that the confession was inadmissible against Martinez by virtue of the decision in *Escobedo*. With reference to the effect on defendant Aranda of receiving in evidence the confession of defendant Martinez, it was said (pp. 526-527): "Accordingly, we have held that the erroneous admission in evidence of a confession implicating both defendants is not necessarily cured by an instruction that it is to be considered only against the declarant. [Citations.] The giving of such instructions, however, and the fact that the confession is only an accusation against the nondeclarant and thus lacks the shattering impact of a self-incriminatory statement by him [citation] preclude holding the error of admitting the confession is always prejudicial to the nondeclarant. In the present case, however, it is reasonably probable that a result more favorable to Aranda would have been reached had Martinez's confession been excluded. The error therefore resulted in a miscarriage of justice."

In the present case, the court received evidence of Sosa's statements to the officers and instructed the jury that such statements should be considered only against Sosa. A similar instruction was given with reference to the evidence as to Lisboa's statements.

Sosa's statements, which were to the effect that he had not been in Mr. Takada's room, made no reference to Lisboa and do not implicate Lisboa in the murder; and, as above stated, Sosa's statements were admissible against Sosa under the *Escobedo* rules. The court did not err in receiving evidence as to Sosa's statements.

Lisboa's statements, which were to the effect that he went upstairs to his room alone and then saw Sosa hitting Mr. Takada with the pipe and a screwdriver, implicated Sosa in the murder. As previously stated, however, Lisboa's statements were not inadmissible against him, and Lisboa testified that when he went to his room he saw Sosa hitting Mr. Takada with the pipe and screwdriver. Furthermore, Mrs.

Rivera testified that she saw Sosa severely beating Mr. Takada with the pipe. It is not reasonably probable that a result more favorable to Sosa would have been reached if Lisboa's statements had been excluded. The court did not err in receiving evidence as to Lisboa's statements.

■ Appellant Sosa further contends that the court erred in denying his motion to sever the trial. He asserts that he was denied due process of law in that a conflict arose between the defendants at the start of the trial when Sosa "moved for a continuance" and Lisboa opposed the motion; that there was a further conflict in that Sosa "denied the murder" whereas Lisboa "denied participation in the murder, but implicated Sosa in his statements to Officer Alexander," and testified that he saw Sosa commit the murder; and that he (Sosa) was forced to be tried by two prosecutors—"The state was the formal prosecutor, Lisboa, the insidious prosecutor."

In *Aranda, supra,* the Supreme Court prescribed (pp. 530-531) new rules for the severance of joint trials, as follows: "When the prosecution proposes to introduce into evidence an extrajudicial statement of one defendant that implicates a codefendant, the trial court must adopt one of the following procedures: (1) It can permit a joint trial if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice to the declarant. . . . (2) It can grant a severance of trials if the prosecution insists that it must use the extrajudicial statements and it appears that effective deletions cannot be made. (3) If the prosecution has successfully resisted a motion for severance and thereafter offers an extrajudicial statement implicating a codefendant, the trial court must exclude it if effective deletions are not possible. . . ."

In *People* v. *Charles, supra,* however, it was said (p. 337) that "failure to adhere to the *Aranda* procedure constitutes reversible error only if it causes prejudice." It was also said (p. 338): "Although the present case was tried by a judge sitting without a jury, we need not decide whether that fact alone would preclude the requisite showing of prejudice, since we find no reasonable probability in this case that even a jury would have returned a more favorable verdict for either defendant if, as required by *Aranda,* the defendants had been tried separately or each confession had been 'edited' to include no references damaging to the nondeclarant."

In the present case, where the statements of each defendant

were admissible against the declarant, and where Mrs. Rivera and Lisboa testified that they saw Sosa in Mr. Takada's room beating him with the pipe, where there was blood on Sosa's hand after the beating, and where Sosa's fingerprint was found on the door of Mr. Takada's room, it is not reasonably probable that the jury would have returned a more favorable verdict for Sosa if the defendants had been tried separately or if Lisboa's statements had been "edited." The denial of Sosa's motion for a separate trial did not constitute reversible error.

Appellant Sosa's further contention that he was not effectively represented by counsel at the trial, because his counsel (deputy public defender) and the murder victim (Mr. Takada) were of Japanese descent, is without merit. The record shows that said counsel represented defendant diligently and effectively at all stages of the trial.

Appellant Lisboa's contention that the evidence is insufficient to support the verdict finding him guilty of murder is also without merit. Caldera testified that Sosa and Lisboa went upstairs together. Mrs. Rivera testified that she heard two men talking in Mr. Takada's room; one of them said, "Let me do it next time"; and when the door opened Lisboa started out, while Sosa was beating Mr. Takada with a pipe. There was also evidence that after the beating, Lisboa immediately left the hotel, and, although he knew the police were looking for him, he remained at large until he was arrested about two weeks later.

Appellant Sosa also contends that the court erred in refusing to appoint separate counsel to represent him on this appeal. The record shows that after an attorney was appointed to represent defendants on appeal, Sosa petitioned the court for an order appointing separate counsel. In appellant's brief the appointed attorney states that he "concluded that he could present both appeals with propriety." Said counsel has represented appellants ably.

Sosa's appeal from the order denying his motion for a new trial is dismissed.

The judgments are affirmed.

Fourt, J., and Lillie, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied July 19, 1967.