[Crim. No. 7327.    First Dist., Div. Three.    Mar. 18, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. LOREAN
SMITH, Defendant and Appellant.

Pettis & Brott and Howard C. Hall for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Robert R. Granucci and John T. Murphy, Deputy Attorneys General, for Plaintiff and Respondent.

DAVID, J. pro tem.* — Appellant Lorean Smith was charged with the murder of Clifton Allen (Pen. Code, § 187), pleaded not guilty, was tried by the jury and convicted of voluntary manslaughter (Pen. Code, § 192). Motions for a new trial and probation were denied, and she was sentenced to state prison for the term prescribed by law.

Three grounds for reversal of the conviction and judgment are urged.

(1) Was it prejudicial and reversible error for the prosecution to refer to appellant's blood alcohol test taken after the killing, in asking for a stipulation for the admission of the report, when it previously was denied admission into evidence for want of a proper foundation and in referring to the taking of the test in arguing appellant's credibility?

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

(2) Was it prejudicial and reversible error for the prosecution to attempt to offer evidence relative to a prior shooting in which appellant was involved?

(3) Did the court err in impliedly finding that appellant waived the presence of her attorney, before giving her statement to the police officers on November 6, 1966, and in refusing to rule that *Miranda* v. *Arizona*, 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] barred receipt in evidence of a tape recording of her statement?

Since we rule against the appellant on the points tendered, the judgment and sentence are affirmed.

There was little or no essential conflict in the evidence presented by the People to support the charge on the one hand, and that advanced by appellant who claimed self-defense on the other.

On Sunday evening, November 6, 1966, appellant telephoned the Richmond Police Department. On the witness stand in her own behalf, Lorean Smith stated "I told them I had shot a man and I told them where. . . . He said someone would be right out." Officer Wilhelm came right over. The place where the killing occurred was Jackson's Cafe in Richmond. Scuffling and fighting were not uncommon there. The man killed by a bullet from Lorean Smith's .25 caliber revolver was Clifton Allen. The appellant herself and other eyewitnesses told the story.

Miss Smith sat on a bar stool next to Allen, who was almost dead drunk. A senseless argument developed between them, sparked by her refusal to be treated to a beer by him, and a refusal by her to discuss the death of a former waitress at the cafe. Lorean Smith arose to go to the door and he hit her with a backhanded sweep of his arm and pushed her against a partition. With that, Lorean Smith asked, "did he want to fight?" He said "Yes." He responded, "Yes, G-d-it, I'll kill you. I'll kill you." They tussled on the floor. This lasted 10 to 15 minutes. He knelt over her, a knee in her stomach, clutching her hair, choking her, and banging her head on the floor. Miss Smith did not have her usual strength to fight back. She was three months pregnant. She was doing what she could to get him off, but was using her hands to get her bag open. None of the spectators intervened. Finally, she said "I'm going to kill you for this." She unzipped her purse, pulled out her gun and shot him. As she pulled out the gun, the 15 or 20 customers cleared out. A waitress, Mrs. Profit, ran to the kitchen and hid behind the deep freeze. Lorean

Smith's friend at the bar, Dessie Bernstein, said "Lorean, I think you done killed the man." Lorean said "Nobody mess over me." Going to the phone, gun in hand, Lorean telephoned the police and her mother. To the latter she said "Mama, I just shot a man."

Her arrest followed the arrival of the police and surrender of the gun. She was taken to nearby Brookside Hospital for a blood alcohol test, thence to the Richmond Hall of Justice, where she gave a tape-recorded statement. She was then taken to the Kaiser Clinic where she was examined for any injuries. Only a small bruise on her temple was found, and the doctor testified she gave no physical evidence of having been beaten severely.

The prosecutor's references to the blood alcohol test did not constitute prejudicial misconduct. If intoxication is a material point, the report of the test is proper evidence. To produce the results thereof is not prohibited self-incrimination. (*People* v. *Haeussler*, 41 Cal.2d 252 [260 P.2d 8], cert. den. 347 U.S. 931 [98 L.Ed. 1082, 74 S.Ct. 533]; *People* v. *Conterno*, 170 Cal.App.2d Supp. 817, 826, 829 [339 P.2d 968].) Sergeant Rodden testified such a test was made. He was not permitted to state the results, for want of a proper foundation. The report itself was offered, and denied admission for the same reason.

Almost immediately thereafter the prosecution, in excusing Sergeant Rodden, asked defendant's counsel if he was aware of the existence of the report of the test. No actual reference was made to what the report said. The court sustained an objection, and directed the jury to disregard these remarks. If there was error in asking such a question, and we find none, it must be assumed to have been cured by this direct admonition to the jury. (*People* v. *Brice*, 49 Cal.2d 434, 437 [317 P.2d 961]; Witkin, Cal. Criminal Procedure, § 751, pp. 724-725.) Appellant's counsel indicated that if he could inspect the report, he might stipulate to it. Thereafter he did not stipulate. Since Sergeant Rodden had testified Lorean had gone to Brookside Hospital for the test, which she did not recall or denied, it was not misconduct to allude to this in argument before the jury. At least it had a minimal bearing on credibility. The judge admonished the jury to disregard this also. The seriousness of the crime charged does not increase in proportion to inebriation of a killer; but intoxication may work for him in excusing criminal irresponsibility due to "diminished capacity." (*People* v. *Conley*, 64 Cal.2d 310 [49

Cal.Rptr. 815, 411 P.2d 911].) So appellant cannot claim prejudice from peripheral references to evidence which might have helped her, except for her counsel's diligence in excluding it.

. This did not, as appellant claims, imply "the existence of facts which the People made no effort to prove and had no reason to believe could be proved," as was the situation involved in *People* v. *Lo Cigno,* 193 Cal.App.2d 360, 388 [14 Cal.Rptr. 354].

Having failed to object to the extensive evidence as to another prior shooting in front of Jackson's Cafe on March 6, 1965, in which a shot from Lorean Smith's gun grievously wounded John Scott, the admission of such evidence does not require reversal of Lorean's conviction. (Evid. Code, § 353; *People* v. *Kitchens,* 46 Cal.2d 260, 262 [294 P.2d 17]; 3 Cal. Jur.2d, § 156, p. 634; 5 Am.Jur.2d, § 601, p. 66.) The court instructed the jury to disregard all such testimony. (*People* v. *Kelley,* 66 Cal.2d 232 [57 Cal.Rptr. 363, 424 P.2d 947]; *People* v. *McCaughan,* 49 Cal.2d 409, 421-422 [317 P.2d 974].)

Evidence Code section 1101 provides that evidence of specific instances of a person's character or a trait of his character, is inadmissible when offered to prove his conduct on a specific occasion. In this case, the evidence certainly was not tendered to prove the admitted fact that Lorean Smith shot Allen.

On the other hand, Evidence Code section 1101 excepts evidence from the exclusionary rule when tendered to prove some fact (such as motive, intent, preparation, plan, knowledge, or absence of mistake or accident) other than a person's disposition to commit such acts; and likewise permits the admissibility of such evidence offered to support or attack the credibility of a witness. (Evid. Code, § 1101, subd. (c).) At least on the latter ground, perhaps the People were entitled to have had the evidence before the jury. Why did she carry her concealed gun to the cafe, after the day's work for Avon was over? She did not have any collections with her; she had to get money from others to telephone the police and her mother after the shooting. The evidence perhaps was relevant to a common design, plan or modus operandi to overcome the defense of innocent intent, which would make the homicide justifiable. (Pen. Code, §§ 187-189.) The People have not appealed. Lorean Smith cannot claim prejudice when her counsel allowed the evidence to be received without objection or motion to strike. The court instructed the jury to disregard

it. (Cf. *People* v. *Horowitz*, 70 Cal.App.2d 675, 693 [161 P.2d 833]; *People* v. *Nakis*, 184 Cal. 105, 114 [193 P. 92].) ·

We turn to consideration of Lorean Smith's interview with officials at the Hall of Justice on November 6, 1966, relative to her killing of Allen. The year before, she had been interviewed about the Scott shooting; she had told her story; no charges were pressed, the matter lapsed and her gun had been returned to her. She herself had called the police after killing Allen. Her mental attitude there seems apparent. If she had to stand trial, she would need a lawyer; but if her version of self-defense, supported by the witnesses, was accepted, (like that of "accident" or "unknown assailant" in the Scott affair) she might again go her way and get back her gun. She didn't need a lawyer for this, she would hold nothing back in her exculpatory version of the sad affair.

At the police station some few hours after the killing, the constitutional warnings and statement of rights were meticulously given and explained; her responses recorded in writing and likewise tape-recorded; following which Lorean Smith voluntarily told her story. After proceedings out of the presence of the jury, the trial judge overruled appellant's objection to the receipt of the tape recording in evidence; and later, to playing the tape to the jury; and again, to the testimony of one of the interviewing officers, as to what had been said.

A defendant may waive his right to counsel. *Miranda* v. *Ariaona, supra,* 384 U.S. 436 interposes no impediment, other than its requirement (*id.* p. 475 [16 L.Ed.2d p. 724]) that the government must "demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." (Accord: *United States* v. *Smith,* 379 F.2d 628, 633, cert. den. 389 U.S. 993 [19 L.Ed.2d 486, 88 S.Ct. 491].)

Appellant contends that when she said, "Yes I want an attorney at this time" under the rules of *Miranda* v. *Arizona, supra,* 384 U.S. 436 (echoed in *People* v. *Fioritto,* 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]) it automatically required her clearly expressed later wishes to be disregarded, and now requires reversal of her conviction, disregarding overwhelming evidence, including appellant's own testimony on the witness stand. She is inaccurate in such a contention. (*United States* v. *Hayes,* 385 F.2d 375, 377.)

The order of the trial court, admitting appellant's statement into evidence impliedly found (1) the *Miranda* warnings were given; (2) the defendant Lorean Smith knowingly

and intelligently waived her privilege against self-incrimination, (3) she voluntarily, knowingly and intelligently waived her right to have retained or appointed counsel at the interrogation, and (4) the statement of Lorean Smith was freely and voluntarily made.[1]

It is the duty of the judge to determine whether the statements were voluntary. (*Pinto* v. *Pierce,* 389 U.S. 31 [19 L.Ed. 2d 31, 88 S.Ct. 192, 193] ; *People* v. *Green,* 63 Cal.2d 561, 565 [47 Cal.Rptr. 477, 407 P.2d 653] ; *People* v. *Sosa,* 251 Cal. App.2d 9, 17 [58 Cal.Rptr. 912] ; *People* v. *Stafford,* 240 Cal. App.2d 422, 424 [49 Cal.Rptr. 598] ; *People* v. *Schader,* 62 Cal.2d 716, 727-728 [44 Cal.Rptr. 193, 401 P.2d 665], citing *Jackson* v. *Denno,* 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.3d 1205] ; *People* v. *Gonzales,* 24 Cal.2d 870, 876-877 [151 P.2d 251].)

In our view, there was neither prejudice nor error in the rulings of the court. Lorean Smith herself called the police and voluntarily admitted the killing at that time. Having let the cat out of the bag voluntarily, she could not thereafter lock it and her pistol in her bag with a Fifth Amendment zipper. Testimony of those present at Jackson's Cafe was entirely adequate to establish the prosecution's case, and indeed to support the appellant's claim of ''self-defense'' as well, without her testimony on the stand or as recorded on the tape. Miss Smith's waiver was freely, knowingly and intelligently made. (Cf. *People* v. *Hill,* 66 Cal.2d 536, 553 [58 Cal. Rptr. 340, 426 P.2d 908].) Her voluntary statements to the police officers did not provide any illicit keys with which the police unlocked doors to discover other hidden evidence in the case.

There was no coercion, compulsion or cajolery employed, such as that condemned in *People* v. *Fioritto, supra,* 68 Cal.2d 714. In that case, after refusing to waive his rights, the defendant was confronted with his two accomplices who had confessed and implicated him. This was held to have overcome his free choice. Miss Smith's free choice was not so compelled. We have closely read and carefully considered the record. The circumstances do not suggest, and it is not contended, that Lorean Smith took the stand or made any statements there

[1] A ruling upon the admissibility of evidence does not require a specific finding of fact or conclusion of law, in the usual sense. But since *Miranda* asserts that the government is under a ''heavy burden'' in establishing a waiver, it is recommended that the trial court in such instances specify such determinations in its order ''with unmistakable clarity.'' (Cf. *Evans* v. *United States,* 375 F.2d 355, 360.)

because her tape-recorded statement was received in evidence. The rules of *People* v. *Spencer,* 66 Cal.2d 158 [57 Cal.Rptr. 163, 424 P.2d 715] therefore are satisfied.

Examined upon the witness stand, she testified after having heard the tape played in court, that her statement at the police station was not made under any threats or duress, no one was hurting her at the time, "having her arm twisted or anything like that"; no one was being mean to her in any way at the police station, they didn't do anything to her while the tape was taken; that the tape was an accurate recording of what transpired at the police station that night; that she made all those statements that night because she believed they were true; that she had not changed her mind about any of the statements on that tape since the time they were taken; all the statements she made to the officer on that tape were true to the best of her knowledge; that she still felt they were true; there was not anything upon the tape that she heard that she changed her mind about. This tape included all of the conversations in which she said she did not want an attorney at the interrogation.

Under such circumstances we find no prejudice to appellant. ▉ Even if erroneous, an admission of evidence of facts subsequently proved by defendant's own testimony is harmless. (*People* v. *Cohen,* 94 Cal.App.2d 451 [210 P.2d 911]; *People* v. *Moya,* 53 Cal.2d 819 [3 Cal.Rptr. 360, 350 P.2d 112]; *People* v. *Dorsey,* 144 Cal.App.2d 258 [300 P.2d 885]; *People* v. *Burns,* 27 Cal.App. 227 [149 P. 605]; *People* v. *King,* 234 Cal.App.2d 423 [44 Cal.Rptr. 500], cert. den. 384 U.S. 1026 [16 L.Ed.2d 1033, 86 S.Ct. 1957]; *People* v. *Luckman,* 235 Cal.App.2d 75 [45 Cal.Rptr. 41].)

*Miranda* wears a skirt of many pockets, and sometimes it is difficult to know in which a given cause fits. (*Miranda* may be at times an unruly wench in the house of the fathers. *Mathis* v. *United States,* 391 U.S. 1 [20 L.Ed.2d 381, 88 S.Ct. 1503], a 5 to 3 decision, one justice not participating.)

Thus while *Miranda* (*id.* at pp. 473-474 [16 L.Ed.2d at pp. 722-723]) dictates that if the individual states that he wants an attorney, the interrogation must cease until an attorney is present, the case draws a distinction between questions relating to a defendant's understanding of his rights or waiver of them, on the one hand, and *interrogation,* developing the facts under investigation, on the other.

(By definition, "to interrogate" is "to question typically with formality, command, and thoroughness for full informa-

tion and circumstantial detail'' and ''interrogation'' is ''the act of interrogating.'' (Webster's Third New Int. Dictionary, p. 1182.)

This appears from the direction given in *Miranda,* at page 485 [16 L.Ed.2d at p. 730], approving the F.B.I. practice set forth in a quoted letter: ''When the person who has been warned of his right to counsel decides that he wishes to consult with counsel before making a statement, the interview is terminated at that point. . . . If he is indecisive in his request for counsel, there may be some question on whether he did or did not waive counsel. Situations of this kind must necessarily be left to the judgment of the interviewing agent. For example, in *Hiram* v. *U.S.,* 354 F.2d 4 (1965), the Agent's conclusion that the person arrested had waived his right to counsel was upheld by the courts.''

The United States Supreme Court in *Miranda* (*id.* pp. 483-484 [16 L.Ed.2d pp. 728-729]) says this letter ''makes it clear that the present pattern of warnings and respect for the rights of the individual followed as a practice by the FBI is consistent with the procedure which we delineate today.''

Both the conduct and answers of Lorean Smith taken as a whole were indecisive whether she wanted a lawyer before making her statement. Further meticulously fair questions were asked to resolve her actual desires. She freely expressed her desire to change her checkmark on the *Miranda* questionnaire before her, requesting an attorney at that time. ''A. It doesn't matter. Q. Now, understand, Mrs. Smith, if you change this, you are doing it freely and voluntarily? A. Sure. Q. Nobody is threatening you to do this. A. That is true. Q. And you feel that you do want to talk to us at this time, is that correct? A. I don't mind.''

Previously she had stated, ''Oh, no, I don't mind answering anything that you ask according to what has happened down here, but if I do need a lawyer, then I don't mind getting one, but at the present time I don't see what I need one for.''

Told she could call a lawyer right then, she answered ''I don't have anything to hold back from you.''

It was the duty of the officers to proceed with the inquiry to fully develop what Miss Smith's desires were at that time. (*United States* v. *Nielsen,* 392 F.2d 849, 853.)

In *Narro* v. *United States,* 370 F.2d 329, 330, the same issue was involved: ''Appellant's claim is that her confession is inadmissible simply because she informed the Commission

that either her mother or father would get an attorney for her, . . . but then decided to make a confession immediately thereafter without obtaining counsel.

"In *Miranda* v. *State of Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the Supreme Court said: 'After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement.'

"Thus the cases in which it is clear that the warnings have been given must be considered on their own facts in order to determine the question of waiver. The courts must do this on an *ad hoc* basis, since no *per se* rule has thus far been adopted dealing with this problem. The evidence here seems ample to warrant the conclusion that the appellant freely and voluntarily gave her statement after having been made fully aware of her rights by both the Commission and the investigating officers. The judgment is affirmed."

Certiorari was denied by the United States Supreme Court, 387 U.S. 946 [18 L.Ed.2d 1334, 87 S.Ct. 2081].

In *United States* v. *Plata*, 361 F.2d 958, certiorari denied 385 U.S. 841 [17 L.Ed.2d 74, 87 S.Ct. 94], it is related (p. 960) : "Hanley asked defendant if he would submit to a polygraph, to which he responded that he wanted to cooperate but that he would like to talk to a lawyer. Hanley attempted on two occasions to telephone the lawyer suggested by defendant but was unable to reach him. Defendant was asked if he was willing to sign a consent to the search and thus save the time and trouble of obtaining a search warrant. He replied, 'Yes, you can search my house, my car and everything.' He then read and signed the written consent prepared by an agent. At the time, he admitted he had been advised of his constitutional rights."

The court held there was no evidence of harassment, threats, coercion or intimidation.

"His own testimony claims that he gave his consent for personal reasons, with the expectation that a search of his premises would do him no harm."

He testified on a motion to suppress the evidence. The court held defendant's own testimony showed the statements were voluntary.

Certiorari was denied. In the petition for certiorari appellant unsuccessfully relied upon *Miranda* (see footnote, *United States* v. *Nielsen, supra*, 392 F.2d 849, 855.)

We find no error in the rulings of the trial judge. Appel-

lant's initial written indication that she wished an attorney, modified by her oral statements, and crossed off with her consent, was not a talismanic "King's X." Under the facts here, we do not believe that the indicated language of *Miranda* in *People* v. *Fioritto, supra,* 68 Cal.2d 714, requires that the conviction and judgment should be reversed, and the case remanded for a purified retrial.

Even assuming the law at times is what Mr. Tutt called it, it is not required to be stupid here. Even if there had been any error in the proceeding, there is no reasonable possibility that a result more favorable to appellant would have been reached, had her initial statement been excluded. (*Stroble* v. *California,* 343 U.S. 181, 197 [96 L.Ed. 872, 884, 72 S.Ct. 599]; *Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 750, 87 S.Ct. 824].) Upon retrial, the elimination of the tape-recorded statement would leave the evidentiary total substantially unimpaired. Thus, to reverse for purposes of retrial would be a pointless exercise in feckless futility, a miscarriage of justice in turn prohibited by California Constitution article VI, section 13 (formerly section 4½).

The judgment is affirmed.

Draper, P. J., and Brown (H. C.), J., concurred.