[Crim. No. 548.  Fifth Dist.  Sept. 29, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN DIAZ, Defendant and Appellant.

548

Rudy L. Savala, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edward A. Hinz, Jr., and A. Wells Petersen, Deputy Attorneys General, for Plaintiff and Respondent.

DAVID, J. pro tem.*—John Diaz and Daniel Arenas appealed from their judgments of conviction, each having been

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

found guilty after a jury trial on two counts of armed robbery, and on six counts of kidnaping for the purpose of robbery. (Pen. Code, §§ 211a, 969c, 3024 and 209.) The appeal of Arenas has been dismissed.

The trial court in its abstract of judgment found that Diaz was armed with a deadly weapon at the time of commission of each of the robberies within the meaning of Penal Code sections 969c and 3024. The jury found, ''We find the charge of being armed with a deadly weapon, to wit, a gun, in Count Seven of the information, to be true,'' after finding him guilty of armed robbery under section 211a of the Penal Code on March 3, 1967, and made similar findings in regard to the robbery on April 22, 1967.

Throughout these proceedings the defendant, John Diaz, has been known as Sam Paul Redbear.

The two robberies occurred at the J. C. Penney Company stores, one in Selma on March 3, 1967, and the other in Sanger on April 22, 1967. In each instance, the appellant purported to make a purchase after which he and Arenas at gunpoint forced store attachés to deliver money to them from the cash register and safe, and at gunpoint herded them to a restroom or lounge where they were bound with string and scarves, some being forced to lie on the floor.

■ Diaz first contends that he was denied due process of law by being tried jointly with his codefendant Arenas. This contention cannot be sustained. Diaz and Arenas were joint actors in the robberies and kidnapings, and were jointly charged therewith. Pursuant to Penal Code section 1098, such codefendants are compelled to stand trial together, in the absence of an order of the court otherwise. Thus, the order of the trial court consolidating the cases for trial was superfluous. There was no motion to sever the trials. Even if the opposition to granting the order for consolidation were to be considered to be a motion for severance of the causes, no abuse of discretion was shown. (*People* v. *Lopez*, 60 Cal.2d 223, 253 [32 Cal.Rptr. 424, 384 P.2d 16].) ■ Joint trials are eminently proper where, as here, the underlying charges depend upon mutual action, common facts or common evidence. (*People* v. *Alvarado*, 255 Cal.App.2d 285, 288-289 [62 Cal. Rptr. 891].)

This is not a situation where the consolidated trial related to separate and unrelated offenses (cf. *People* v. *Chambers*, 231 Cal.App.2d 23 [41 Cal.Rptr. 551]) nor a situation embracing such problems of constitutional dimension as were

involved in *People* v. *Aranda*, 63 Cal.2d 518, 530-531 [47 Cal, Rptr. 353, 407 P.2d 265].

The testimony Diaz alluded to did not concern their joint participation in the holdups, but consisted of the admissions by Arenas of his prior felony convictions before the jury. Allegedly, when Arenas admitted what a bad man he was, this influenced the jury against Diaz, on the principle that "birds of a feather flock together." But certified copies of the records of Arenas' convictions were displayed to the jury, without any objection on the part of counsel for Diaz. The direct evidence of the individual commission by Diaz of each of the felonies charged against him renders fantastic any claim that his guilt arose only because the blackness of Arenas rubbed off on him. If they were "birds of a feather," it was indeed because they "flocked together" in the holdups in question.

When evidence was presented that, after arrest, Arenas "flew the coop," the court carefully admonished the jury that this escape had nothing to do with the guilt or innocence of defendant Diaz, and was only to be considered in relation to the charges against Arenas, that any evidence admitted against one defendant but denied admission against the other could not be considered against that other (CALJIC No. 39 Rev.). Under the circumstances here, it is manifest that such instructions cured any error claimed to exist by failure to separate the trials. (*People* v. *Smith*, 185 Cal.App.2d 638, 644 [8 Cal.Rptr. 581].)

Finally, Diaz contends that a new trial must be ordered on the ground that he was subjected to scrutiny and identification at two lineups at which he concededly was not represented by counsel, relying upon *United States* v. *Wade*, 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]. In that decision, the United States Supreme Court held that a defendant's right to presence of counsel in a criminal case extended to all critical proceedings leading to trial, of which a police lineup is one. The object of this judicial extension of the constitutional right to counsel to the police lineup is to guard against improper. "suggestive" influences that might materially affect the reliability of the identification made by the witnesses at this critical stage of the criminal proceedings. A defendant's lawyer is needed, not necessarily to give legal advice but to observe; to be able to reconstruct at the time of trial any unfairness that occurred at the lineup, so that the accused may not be deprived of his "only opportunity mean-

ingfully to attack the credibility of the witness' courtroom identification" (*United States* v. *Wade, supra,* p. 232 [18 L.Ed.2d 1160]).

Thus, both Diaz and his counsel should have been notified of any impending lineup. Counsel's presence was a requisite to valid conduct of any such lineup, unless defendant made an intelligent waiver of counsel. (*United States* v. *Wade, supra,* 388 U.S. 218, 237 [18 L.Ed.2d 1149, 1162-1163].) Otherwise, in-court identification of the witnesses who identified the accused at the lineup, unrepresented by his counsel, is subject to exclusion. However, such in-court evidence is not to be excluded without giving the People "the opportunity to establish by clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the lineup identification." (*United States* v. *Wade, supra,* p. 240 [18 L.Ed.2d 1164-1165].) Or, instead, an identification must be made by means sufficiently distinguishable to be purged of the primary "taint."

Near the end of this trial, outside of the presence of the jury, the court was presented a transcript of certain statements made by Diaz or Sam Paul Redbear on July 17, 1967, at the county jail. It was stipulated that if a qualified reporter, Earl Christiansen, were present he would testify that the questions and answers given in the transcript were the questions and answers given at the time they were taken down by him. The transcribed statements are as follows:

"Mr. Baxter: Q. Sam, this is —— you know Sergeant Conway from the Sheriff's Office?

"A. Yes.

"Q. This is Mr. Christiansen. He is a court reporter and he is taking down everything that is said. And my name is Mr. Baxter, with the District Attorney's Office.

"A. Yes.

"Q. You have already been advised of your rights, is that correct?

"A. Yes.

"Q. Just to review them again, you have a right to remain silent and make no statement or answer any questions. Anything you say may be used against you in a court of law. You also have a right to have an attorney present now and during any questioning, interrogation or other proceedings. If you cannot afford to hire an attorney, one will be appointed to represent you before you are questioned, if you wish. Do you understand the rights I have just read?

"A. Yes.

"Q. Understanding these rights, do you consent to talk to us now?

"A. Yes, I would like to have an attorney.

"Q. You would like to have an attorney?

"A. Yes.

"Q. O.K. That is as far as any questioning or anything like that is concerned, is that correct?

"(Witness nods head.)

"Q. Sam, what we would like to do is have a lineup. You have a right to have an attorney present during that lineup. If you don't have the funds to hire an attorney to be at the lineup, one will be appointed for you by the Court. Do you waive the right to have an attorney present at the lineup?

"A. Yes.

"Q. In other words, you're willing to go ahead and have a lineup without having an attorney there, is that correct?

"A. Don't make much difference. I would like—or either in court.

"Q. I don't think I understand your answer. But do you consent to participate in the lineup without an attorney there?

"A. Well, you was going to pick me out awhile ago, wasn't you? I mean that's—that's the way I understand it, that you would pick me one out for the lineup—or I mean—well, O.K. Tomorrow to court.

"Q. Well, let's put it this way, Sam. As far as your case is concerned, if a criminal complaint is filed against you, when you appear in court the Judge will appoint an attorney for you, if you don't have the funds to hire one. Now this takes place later, but what we want to do now is hold a lineup and I want to again tell you that at this lineup you have a right to have an attorney, and if you don't have the funds to hire an attorney, one will be appointed for you right now. Do you understand your right? Do you waive those rights?

"A. Yes.

"Q. In other words, you do consent to participate in the lineup now and you waive your right to have an attorney?

"A. Yes.

"Q. Is that correct?

"A. Yes.

"Q. Now as to the lineup, that was already held, do you also waive your attorney as far as that lineup is concerned?

"A. Yes.

"Q. Do you understand that you could have one free of charge, one would be appointed for you, is that right?

"A. Yes.

"Mr. CONWAY: Q. Sam, you know what the lineup is, that is where you went into the room, stood there with five other men and more like a routine question?

"A. Yes.

"Q. The lights were turned on and the people who were the victims of the case looked at you through a one-way glass where you couldn't see them, but they could see you?

"A. Yes.

"Q. And you were in there with these other five men for a period of what, about fifteen, twenty minutes?

"A. I imagine so, yes.

"Q. And as far as you were concerned no one violated any of your rights or anyone threatened you or promised you anything in regard to it, did they?

"A. No.

"Q. You are willing to stand there and let these people who are the victims of these cases look at you to see if they believe that you are the man that committed the robbery or not, is that correct?

"A. Correct.

And again, "Mr. BAXTER. Q. In other words, as I understand your statement, Sam, before you are questioned about the crime you want an attorney present?

"A. Yes.

"Q: As far as the lineup is concerned you waive those rights to an attorney. Is that right?

"A. Yes.

"Mr. BAXTER: O.K.

"Mr. CONWAY: Fine.

"Mr. BAXTER. Q. No promises or threats have been made to you for that statement. Is that correct?

"A. Yes."

This is an effective waiver by Diaz of the claimed right. It seems to be the theory of appellant's counsel that Diaz's demand for an attorney at any interrogation prevented any subsequent waiver of his right to have an attorney present at the lineup, or at another lineup (not identified in the record) held previously to the waiver. The decision in *United States* v. *Wade, supra,* 388 U.S. 218, expressly indicates that there may be such a waiver; and nothing in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974],

holds otherwise. (cf. *People* v. *Goodridge,* 70 Cal.2d 824, 834-836 [76 Cal.Rptr. 421, 452 P.2d 637]; *People* v. *Smith,* 270 Cal.App.2d 715, 720 [76 Cal.Rptr. 53].)

We are satisfied that the appellant freely and intelligently waived his right to counsel at the lineups. The evidence is clear and convincing that the in-court identifications were based on observations of Diaz, alias Sam Paul Redbear, other than at the lineup. Only a few of the store attachés present at the robberies saw Diaz at the lineup. The testimony of the other attachés alone fully identified him, and his fingerprints were sufficient identification to link him to the Sanger store robbery. Finally, counsel for appellant made no motion to exclude or to strike the testimony of any of those few identifying Diaz at the lineups, nor to introduce any evidence impugning the fairness of the lineups themselves. This alone precludes appellant's complaint on appeal. (See *People* v. *Rodriguez,* 266 Cal.App.2d 766, 769-770 [72 Cal.Rptr. 310].)

█ Identification did not depend at all upon the lineups, as the facts will indicate.

In neither of the holdups did Diaz or Arenas wear masks. Diaz had a noticeable scar upon his left cheek. Defendant's hat produced in court was testified to be the same or similar as that worn at the time of the holdups.

At the Selma store, Grace Olivas waited upon Diaz, face to face, for a period of 10 minutes or more before he abandoned his role as a customer and announced, "This is a holdup." Diaz conversed with Michael Chapman, the frightened cleaning boy, and tied up his hands. Cheryll Bittner and Rose Steigleder, other store attachés, observed the holdup men, face to face, over a period of time. Pat Garcia was in the balcony of the store, and hence was not forced at gunpoint into the shoe storage area where other employees were tied up.

On March 3, 1967, the day in question, Grace McLean, as the head saleswoman of the store, was on the lookout for shoplifters. She had seen and paid particular attention to Diaz and Arenas loitering outside of the store prior to the holdup. At closing time, both Arenas and Diaz were in the store; she was waiting upon Victoria Anderson, a customer. Grace McLean stopped to latch the front door, and then went back to help Mrs. Anderson, Arenas took hold of her and at gunpoint had her accompany him to the cash register area. At that spot, she observed Grace Olivas and Cheryll Bittner taking the money out of the register and placing it into a bag with Diaz standing over them. Diaz ordered them back to the shoe

supply room. "He was saying 'Hurry up, Hurry up,' and something about ready to kill a policeman—he had already killed a policeman and didn't want to hurt us." Mrs. McLean was forced to lie face down but was not tied. Then, Michael Chapman was asked where the safe was, and he said he did not know. Mrs. McLean indicated she knew the combination to the safe. Diaz yelled at her to come out, then to get back. At that time, Arenas came up and escorted her to where the safe was. En route they came upon Rose Steigleder, whom he forced to face the wall; he compelled Mrs. McLean to open up the safe. She was then returned to the shoe storage area where Diaz told her to "Get over there and lay down."

Victoria Anderson, the customer, was brought to the shoe storage area and bound. The holdup men departed. Chapman got free, and freed the others.

After being freed, those involved immediately gave descriptions of the two men to the police. Grace Olivas, Michael Chapman and Cheryll Bittner collaborated in making a composite drawing of each of the two. It is significant to note that after an anonymous tip had put the police on the trail of the two men, they readily identified them from these composite sketches.

In court, all the employees and Mrs. Anderson positively identified the two defendants as the men who held up the Selma store. Cheryll Bittner spoke of the scar upon appellant's face. She knew what the gunmen wore. Grace McLean was absolutely positive in her identification, and so was Victoria Anderson, the customer, who also gave a detailed description of them. Bittner, McLean and Anderson were not shown to have been present at any police lineup for identification of Diaz after he was apprehended.

Turning to the Sanger store, the general holdup procedure resembled that in the Selma store. Bonnie Mercer, Jean Mann, Phyllis Lowellen, and Scott Hyde were employees. At gunpoint, they were sequestered and tied in a lounge while the two holdup men took the money from the cash register. The manager, John Bristol, walked into the holdup scene and at gunpoint was forced to open the safe and hand over the money. This was placed in a J. C. Penney Company brief case, later found in the Parlier dump, together with sales markers from the Sanger store. In the lounge, where the employees were laid down and tied, there was a mop. Forcing Jean Mann to lie down in the lounge, the defendant Diaz picked up the mop and moved it out of the way. Following

the robbery, fingerprints on the mop handle were positively identified as his.

Bonnie Mercer, immediately after the incident, gave a description of the men to the police.

In court, all of the five employees positively identified Diaz as one of the holdup men. Mercer, Mann, Lowellen and Bristol specifically remembered the scar on his face and details of the dress on that occasion.

None of the personnel from the Sanger store were shown to have participated in any police lineup to identify the defendants.

We are satisfied that the in-court identifications were based upon observations of the suspect Diaz, other than the lineup identification. (*United States* v. *Wade, supra,* 388 U.S. 218, 240 [18 L.Ed.2d 1149, 1164-1165].) There is nothing in the record nor any inference therefrom to suggest that the courtroom identification of Diaz was made by the exploitation of his identification by the few witnesses who participated in the police lineup proceedings. We have held that Diaz waived any objection to any such police lineups held without the presence of his counsel. But assuming that his waiver was ineffective, his identification was sufficiently established by independent means devoid of any primary taint. Unlike the situation in *United States* v. *Wade, supra,* we believe that it can be said with certainty that the witnesses would have recognized the defendant at the time of trial if the intervening lineup had not occurred. The in-court identifications had an independent source. We note, of course, that a minimum of evidence aside from that incidental to the waiver of counsel was presented concerning the lineup identification. (cf. *United States* v. *Wade, supra,* p. 242 [18 L.Ed.2d 1166].)

In cross-examination of Rose Steigleder in reference to the Selma holdup, counsel for Diaz asked her how much time elapsed between the date of the alleged robbery and the first time she saw the defendants. In answer, she stated, ''From March 3 until August something, because whenever the lineup was.'' Thereafter, the district attorney asked, ''Well, is your identification of the defendants based on your observations of them in the store on March the 3rd?'' We turn to the transcript:

''MR. SAVALA: Your Honor, at this time as stated previously we will have to object on this line of questioning. There are certain legal issues that have to be resolved before we can go into that.

"MR. MITCHELL: The matter of lineup was brought out on cross-examination, Your Honor.

"THE COURT: Yes, it was and the question here, I think is proper, though I am not sure it is clear to the witness. Perhaps it should be rephrased. Did you understand the question?.

"THE WITNESS: No, I didn't."

Thereafter the question was asked:

"Well, in other words, do you—you do identify these defendants, whether you had seen them in this lineup or not?

"Yes, I do.

"Q. So, your identification is based on seeing them there in the store that evening, is that right?

"A. Yes."

There is no further cross-examination by counsel for Mr. Diaz.

A newspaper article which referred to the capture of the suspects gave their names. Grace Olivas testified:

"I didn't know it was him for sure, but after I did see him in the lineup I knew it was them, because I recognized them right away, and that's how I learned from there that I started calling him Redbear and the other person Arenas."

No direct testimony was introduced of the identification of Diaz at the lineup by Rose Steigleder and Pat Garcia. On cross-examination, each in turn was asked by counsel for Diaz when the first time was that they had seen the defendants following the holdup, to which they severally responded, "The lineup." The prosecution did not use lineup identification either as alternative to or corroboration of courtroom identification. No attempt was made by the defense to develop the circumstances surrounding the prior lineup identification to impeach the credibility of the in-court identifications. There is not in the record the slightest hint of any improper police suggestion which contributed to any allegedly erroneous identifications. (cf. *People* v. *Ketchel,* 71 Cal.2d 635, 642-643 [79 Cal.Rptr. 92, 456 P.2d 660].) ▮▮ If error there was, in the absence of any objection or motion to strike any of the testimony from witnesses who participated in the lineup, we hold that it was harmless error. In view of the other convincing testimony, no miscarriage of justice has resulted.

The conviction of defendant on the armed robbery counts is proper. (*Gilbert* v. *California,* 388 U.S. 263, 272-273 [18 L.Ed.2d 1178, 1186-1187, 87 S.Ct. 1951].) However, as to the

conviction on six counts of kidnaping, we note that since the filing of this opinion the California Supreme Court has decided *People* v. *Daniels*, 71 Cal.2d 1119 [80 Cal.Rptr. 897, 459 P.2d 225], in which the court redefined the law on kidnaping. Pursuant to the holding in that case, the conviction on the kidnaping counts must be reversed.

■ There is no doubt that a revolver is a "deadly weapon" whether loaded or not. (*People* v. *Aranda*, 63 Cal.2d 518, 532 [47 Cal.Rptr. 353, 407 P.2d 265].) The term "deadly weapon" in Penal Code section 3024, subdivision (f), does not generically control the meaning given to the term in Penal Code section 1203 (*People* v. *Henderson*, 151 Cal.App.2d 407 [311 P.2d 594]). A pistol may be a "deadly weapon" under the definition in either section. Under the facts in this case, the recitation in the abstract of judgment that Diaz was armed with a deadly weapon at the time of the commission of each of the robberies within the meaning of Penal Code sections 969c and 3024 is an immaterial variance from the rule announced recently in *People* v. *Floyd*, 71 Cal.2d 879, 882-883 [80 Cal.Rptr. 22, 457 P.2d 862].

We are persuaded by *People* v. *Floyd*, *supra*, 71 Cal.2d 879, 882-883, that the appellant should be resentenced, and the judgment conformed to that therein described.

The judgment in this case should provide that at the time of commission of each of the instant offenses, sections 3024 and 12022 of the Penal Code were inapplicable, but that defendant Diaz was armed with a deadly weapon within the meaning of that term in Penal Code section 1203, specifying that the deadly weapon was a revolver.

The judgment is reversed, and the cause remanded for resentencing in accordance with the views expressed herein.

Stone, P. J., and Gargano, J., concurred.

A petition for a rehearing was denied October 27, 1969, and the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied November 28, 1969. McComb, J., was of the opinion that the petition should be granted.