[Crim. No. 1936. Fourth Dist. July 6, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. DEWEY LYNN MONTGOMERY, Defendant and Appellant.

Ramsey, Emlein & Cullum and J. Raymond Cullum for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

COUGHLIN, J.—Defendant was convicted of murder in the second degree; was sentenced to imprisonment in the state prison with a recommendation by the trial judge that he be given the minimum term of imprisonment; appealed from the judgment, which was affirmed by this court; and petitioned for a hearing before the Supreme Court which was granted and the cause retransferred to this court for further consideration in light of the decision in *Escobedo* v. *Illinois*, 378 U.S. 478 [84 S.Ct. 1758, 12 L.Ed.2d 977].

We have concluded that the judgment must be reversed because the admission in evidence of incriminating statements made by the defendant constituted prejudicial error under the decisions in *Escobedo* and *People* v. *Dorado*, 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361].

The defendant and Nona Rutledge were the father and mother respectively of Billy John Montgomery; never were married; and, sometime after the birth of the boy, separated. Upon separation, by agreement, the boy was placed in the custody of his father, who thereafter married; supported the child; and maintained him in his household. On March 6, 1963, Nona, who had married Charles Kline, the murder victim, taking advantage of a visit with the boy and the absence of the defendant, who then was at a bar, took the boy to her home. After learning what had happened, the defendant obtained a .22 caliber revolver, together with ammunition; enlisted the help of four male friends; and all five men drove to the Kline residence. The purpose of the trip was to obtain custody of the child. After arriving, the defendant removed the revolver from the glove compartment of his car and loaded it; he and his companions went to the Kline residence; and the defendant knocked upon the door.

In the meantime Nona and her husband, together with Ann and Tom Lawrence, who lived with them, discussed the probability that the defendant might come to their home and cause trouble; had retired at about 10 p.m.; and were awakened by the arrival of defendant and his companions at about 11 p.m. Before retiring, Tom Lawrence, who owned a rifle, suggested to Charles Kline that in the event the defendant should come to their home that he, Lawrence, would answer the door and that Kline should back him up with the rifle.

Pursuant to this prearranged plan, in response to the knocking on the door, Lawrence called through it asking who was there and what he wanted, and was told by the defendant that he, Lawrence, knew who was there and what he, the

defendant, wanted. Kline also talked through the door saying, in substance, that the problem was not his affair but was between Nona and the defendant, and when the latter asked if he could speak to Nona, was told he should "call tomorrow." Nona told him, also speaking through the door, that she was going to keep the boy. At this time Charles Kline was across the room from the door, with his right foot on a couch, and holding the rifle in his right hand with the stock resting on his knee.

When the defendant was told he could not have his son, he backed up; cocked the gun; hit the door with his shoulder, causing it to fly open; and lunged into the room. What happened immediately thereafter is the subject of considerable controversy. There is substantial evidence supporting the conclusion that when the defendant ran through the door into the room he struck the couch; when this occurred Charles Kline fell back against the wall; within a matter of seconds thereafter the defendant's gun was discharged; Kline dropped the rifle; the defendant again cocked his gun and brandished it at Lawrence; and the defendant then went into another room, got his son, and left, warning Mr. and Mrs. Lawrence that if they tried to stop him he would kill them. Thereafter, Charles Kline was found at the back of a neighbor's house. He had been wounded by the shot fired from defendant's revolver; was taken away by ambulance; and died of the wound thus inflicted.

The defendant testified that on entering the house he stumbled and fell against a chair; as he did so the gun went off accidentally; and he did not intend to fire.

 After his arrest, the defendant made incriminating statements in the course of two different interrogations; one was conducted by the police and was taped; and the other was conducted by a neuropsychiatrist as part of a psychiatric examination. There is no showing that before engaging the defendant in either of these interrogations he was advised of his rights to counsel and to remain silent, or that he knowingly and intelligently waived these rights.

The evidence establishes that the interrogation by the police, which was taped, occurred during the accusatory stage of the investigation as that stage is defined in *People* v. *Dorado, supra,* 62 Cal.2d 338, 347, 353. In the course of this interrogation, which was conducted alternately by two officers, whose questions were repetitive, the defendant stated, among other things, that before hitting the door he cocked

the gun; that he kicked the door open and a "guy" had a gun and he shot and ran and got his son, and ran out; that "I know that guy had the gun. He hit me with it, and that is when I fired"; that he did not intend to shoot anybody and thought he shot at the floor; and that, when asked "Were you aware that if you shot a man that you would go to jail?", he replied: "Yeah, I figured. Right then I figured I would rather go. I would just as soon go to jail and not have my son, or even I just as soon be dead as not have my son." Although the statements made to the police can be harmonized with the defendant's defense of accidental shooting, which he asserted at the time of trial, they directly support the contention of the prosecution, as argued to the jury by the deputy district attorney trying the case and reflected in the court's instructions, that the shooting was intentional; that going into the house with a loaded gun in the manner related in the statements was an act dangerous to life; and that the killing was committed in the course of an assault with a deadly weapon.

The court instructed the jury that ". . . the unlawful killing of a human being with malice aforethought, but without a deliberately formed and premeditated intent to kill, is murder of the second degree in either of the following cases: "(1) When the killing results from an unlawful act, the natural consequences of which are dangerous to life, which act is deliberately performed by a person who knows that his conduct endangers the life of another, or

". . . . . . . . . . . . . . .

"(3) When the killing is done in the perpetration or attempt to perpetrate a felony such as assault with a deadly weapon." As a part of its charge the court also defined the offense of assault with a deadly weapon, and distinguished between the offenses of murder and manslaughter by advising that in manslaughter, "the malice, either express or implied, which is an essential element of murder, is wanting, . . .", and that "If a person while committing a felony causes another's death, malice is implied, and the crime is murder." During the course of its deliberations the jury requested further instructions on the issue of malice, in response to which the court stated, in part:

" 'It [malice aforethought] is implied, when no considerable provocation appears or when the circumstances attending the killing show an abandoned and malignant heart.

" 'Malice aforethought, either express or implied is manifested by the doing of an unlawful and felonious act, intentionally, deliberately, and without legal cause or excuse.

" ' . . . . . . . . . . . . . .

"I sort of smiled when I read that, because when I read the words 'abandoned and malignant heart', there is a standing remark among judges 'What are you going to do some day when a jury asks you what an abandoned and malignant heart means?', and we all agree we haven't the slightest idea."

The incriminating statements made by the defendant to the police justified the conclusion that after entry into the victim's home he committed the offense of assault with a deadly weapon and that in the course thereof the victim was killed.

▋ Parenthetically, and because a new trial must be had in this matter, it is proper to note at this juncture that the defendant claims error in giving that part of the instruction which refers to a killing in the perpetration of a felony, such as assault with a deadly weapon, on the ground that it ignored the fact that such an assault may be "committed under mitigating circumstances which would negate the existence of malice in a killing resulting therefrom." He cites no authority in support of this contention. ▋ A homicide that is a direct causal result of the commission of a felonious assault is murder in the second degree. (Generally see *People* v. *Schader*, 62 Cal.2d 716, 732 [44 Cal.Rptr. 193, 401 P.2d 665].) ▋ The instruction was not erroneous.

▋ As the incriminating statements the defendant made to the police admitted acts from which it may be concluded he committed an assault with a deadly weapon upon Charles Kline which resulted in the latter's death, they were tantamount to a confession of murder in the second degree, and the receipt of these statements into evidence constituted reversible error under the rule in *People* v. *Dorado, supra,* 62 Cal.2d 338, as applied in *People* v. *Sears,* 62 Cal.2d 737, 743-744 [44 Cal.Rptr. 330, 401 P.2d 938]; *People* v. *Schader, supra,* 62 Cal.2d 716, 721, 728; *People* v. *Lilliock,* 62 Cal.2d 618, 622 [43 Cal.Rptr. 699, 401 P.2d 4]; *People* v. *Stewart,* 62 Cal.2d 571, 575, 581 [43 Cal.Rptr. 201, 400 P.2d 97]; *People* v. *Machel,* 234 Cal.App.2d 37, 52-53 [44 Cal.Rptr. 126]; *People* v. *Williams,* 233 Cal.App.2d 520, 521 [43 Cal.Rptr. 704]; *People* v. *Collin,* 232 Cal.App.2d 422, 428 [43 Cal.Rptr.

57] ; *People* v. *Finn,* 232 Cal.App.2d 422, 428 [42 Cal.Rptr. 704] ; *People* v. *Mora,* 232 Cal.App.2d 400, 405-406 [42 Cal. Rptr. 725].)

At the trial, the defendant testified that the statements he had made to the police were true, although he temporized his testimony in this regard by saying that part of them related what the police had told him he had done, i.e., they told him he "shot the guy", and when they told him this he assumed that he had shot him and knew that he had. The statements in question are subject to an interpretation presenting a version of the incident materially different from that presented by the defendant's testimony in support of his defense of accidental shooting. Upon this issue the case at bench parallels that in *People* v. *Davis,* 62 Cal.2d 791, 795-797 [44 Cal.Rptr. 454, 402 P.2d 142], the decision in which impels the conclusion that, under the circumstances here, the defendant's testimony respecting the truth of his extrajudicial statements did not render harmless the erroneous admission of those statements into evidence.

Two days after defendant's arrest, and while in custody, he was interviewed by a neuropsychiatrist at the request of the district attorney. The neuropsychiatrist testified that during this interview, which he conducted "with a view towards being a possible witness for the prosecution", the defendant said the child's mother had threatened to take the child from him; "admitted that he would stop at nothing in order to retain custody of the child"; also said that when he broke through the door he saw the victim holding a rifle and thought he fired at the floor or to the side of the man because he "didn't want to hurt anyone"; and later, during the interview said that he may have tried to hit the man because he saw the rifle in the man's hands and he thought it might be fired at him. These statements are of the same incriminating nature as those made to the police and, for the reasons heretofore noted, also are tantamount to a confession of murder in the second degree. The significance of these statements, as well as those to the police, was stressed by the deputy district attorney prosecuting the case.[1]

The Attorney General contends that as the interview by the neuropsychiatrist was not an interrogation by the police the

---

[1] In his closing argument to the jury the deputy district attorney stated, among other things:

"Let's look into the actual state of mind as best we can of the defendant at the time of the shooting, and I think the only thing we can

statements made therein are not within the exclusionary rule announced in *People* v. *Dorado, supra,* 62 Cal.2d 338.

■ The reason for the rule in *Dorado* applies equally to an interrogation conducted by the district attorney, or an agent of the district attorney, as well as by the police. It may be argued that an interview by a neuropsychiatrist for the purpose of ascertaining the mental condition of a suspect does

---

do is to take the statements which he made on several occasions concerning it.

''First I would like to read to you the statements which appear in the tape. . . . (Statements read)

''That is what he said when the police questioned him about it shortly after it happened.

''Is there any suggestion that it is accidental? Was it ever mentioned? ''. . . . . . . . . . . .

''Let me ask you a question: Now, at this point where the defendant had said these things to the police, what type of case would they present for the defense? What type of strategy or what could they hope to expect from a case like that? What kind of defense?

''The defense at that time, 'I shot, but I didn't want to hit anyone'. That is about the best you can say for the defense at that time.

''Trialwise, what kind of shape were they in? They still didn't have any right to be in that house and the shot would be certainly an act—and going into the house with a loaded gun is an act dangerous to life and facing a potential second degree right away at the minimum.

''Now, is this the reason for the change in testimony? Look what the defense had to gain by coming up on the stand and saying, 'It is accidental. It was an accident'.

''It pointed up a whole new field of operations. It gives him the gamut from the top way down to the bottom of walking out the door a free man.

''. . . From there where do we go? We go to Dr. Hunter's interview with the defendant and the statements that he made.
''. . . . . . . . . . . .

''What did he tell Dr. Hunter? Here, again, I would like to point out the three areas. He told Dr. Hunter that the child's mother threatened to take the child from him and at that time he admitted that he would stop at nothing in order to retain custody of the child.

''He also said that he saw the victim holding the gun, the rifle, and he thought that he fired either at the floor or to the side of the man because—and to quote the defendant at this point—'He didn't want to hurt anyone'.

''What does this sound like? It doesn't sound like an accident, does it? It sounds like he is deliberately shooting over here because he just wants to scare someone.

''What do we have particularly? We have the victim with a hole right in the middle of him the way he was probably facing the defendant. Certainly it was a pretty good shot for an accident. It is right where you would hit a man if you were aiming at him and wanted to hit him and wanted to put him out of commission. That is about where it hit and it did do it.

''And then at a later time he says that he may have tried to hit the man. He admitted to Dr. Hunter that he may have tried to hit the man

not constitute a process of interrogation that lends itself to eliciting incriminating statements, as is required by the rule in *Dorado* to impress the stage of the proceedings during which the interview takes place with the accusatory characteristics essential to application of that rule. Here, again, the reason for the rule must dictate its scope. ▮ The neuropsychiatrist conducted the subject interview "with a view toward being a possible witness for the prosecution." An interview conducted under these circumstances is a process of interrogation that lends itself to eliciting incriminating statements. The fact that the neuropsychiatrist may intend to use the results of his interview as a basis for determining the mental condition of the accused does not remove it from a process of interrogation that lends itself to eliciting incriminating statements, nor shield it from the dangers against which the rule seeks to guard an accused. There is as much need for the advice of an attorney concerning the effect of making incriminating statements, and the right to remain silent, during such an interview as during an interrogation by the police. We hold that under the circumstances of this case it was error to admit the incriminating statements made by the defendant to the neuropsychiatrist during the interview in question.

▮ In this, as in many other cases, even though the verdict is supported by an abundance of evidence in addition to any incriminating statements by the defendant, because those statements were tantamount to confessions the judgment must be reversed under the rule stated in *Dorado* and applied in *People* v. *Sears, supra,* 62 Cal.2d 737, 743, *People* v. *Lilliock, supra,* 62 Cal.2d 618, 622, *People* v. *Marbury* ▮ (Cal.

---

because he saw the rifle in the man's hands and he thought it might be fired at him.

"Here, again, how does this fit together with the theory from the stand of it being an accident? It doesn't fit together very good, and I agree that perhaps the defendant might think it is unfair that we considered Dr. Hunter's testimony in that regard, because I think that that pretty well uncovers more truth in this situation and it pretty well shows us that this killing was not an accident; pretty well exposes the reason for this accidental version here.

". . . . . . . . .

"At that time when he is talking to Dr. Hunter, isn't he talking about shooting deliberately, but he is saying, 'I deliberately shot to the side of the man', or, 'I deliberately shot into the floor', or, 'I deliberately shot him because he was going to shoot me'?"

App.) [44 Cal.Rptr. 583], and *People* v. *Collin, supra,* 232 Cal.App.2d 681, 684.

Other contentions by the defendant are based upon errors occurring during the trial which may be eliminated upon a new hearing, and for this reason need not be considered.

The judgment is reversed and the cause remanded for a new trial.

Brown (Gerald), P. J., and Whelan, J., concurred.