[Crim. No. 14974.   Second Dist., Div. Five.   Aug. 26, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. CLIFFORD
JAMES WHITE, Defendant and Appellant.

Walter L. Gordon, Jr., for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James,
Assistant Attorney General, and Larry Ball, Deputy Attorney
General, for Plaintiff and Respondent.

STEPHENS, Acting P. J.—By information filed on July
14, 1967, defendant was charged in two counts with the com-
mission of two murders, in violation of Penal Code section
187, and he pleaded not guilty. On November 27, 1967, the

case was called for trial and a jury trial was waived. By stipulation, the cause was submitted on the testimony contained in the transcript of the preliminary hearing, with each side reserving the right to offer additional evidence, and all stipulations entered into at the preliminary hearing were deemed entered into for purposes of the trial. It was further stipulated that a part of the testimony given at the preliminary hearing (pages 117 through 184 of the clerk's transcript) was not to be considered by the court. On December 6, 1967, the court found defendant guilty of murder in the first degree on both counts. Defendant was then sentenced to state prison for the term of his natural life, and for purposes of sentence, count II was merged with count I. This is an appeal from the judgment of conviction.

The facts relating to the commission of the crimes which resulted in defendant's conviction need not be discussed. The sole issue to be considered on this appeal is whether the admission made by defendant and tape-recorded during the course of police interrogations conducted on August 7 and August 8, 1967 were admissible.

Defendant was arrested at 4 p.m. on August 7, 1967, and taken to the University detective bureau interrogation room for questioning concerning the murders with which he was subsequently charged and of which he was convicted. At the time he was taken into custody, the arresting officer advised defendant's mother that an attorney should be obtained for defendant. At the outset, pursuant to *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], defendant was advised of his constitutional rights, and when asked if he wanted an attorney present during the interrogation, he said that he did.[1] The police then informed defendant

---

[1]Questions by Officer Philip Alexander and answers by defendant, as testified by Officer Alexander:

"Question. That you have a right to speak with an attorney and have the attorney present during this questioning, do you understand that?

"Answer. Yes

"Question. That if you cannot afford an attorney one will be appointed for you without charge before questioning, do you understand that?

"Answer. Yes

"Question. Now, do you wish to make a statement at this time regarding this double homicide case?

"Answer. Yes, I do.

"Question. All right. Do you understand your rights?

"Answer. Yes.

"Question. Do you wish to give up your rights and make a statement?

"Answer. I don't understand you.

"Question. Do you wish to make a statement?

"Answer. Yes, I do.

that an attorney from the public defender's office would not be available until the next morning at 8 a.m. After defendant was told that no attorney would be available until the next morning, defendant agreed to be questioned by the officers. The interrogation was then resumed. The next morning, August 8, 1967, at approximately 10 or 11 a.m., the police again interrogated defendant without further *Miranda* warn-

"Question. Giving up your rights to have an attorney present?

"Answer. I would like one present but since you say it [*sic*] isn't one present, how long will it take to get an attorney present?

"Question. Well, we'll have to find that out. Do you want an attorney present during this questioning session?

"Answer. Yes, I would.

"Question. All right. Fine."

Questions by the deputy district attorney and answers by Officer Roy C. Barclay:

"Q And do you recall if there was a statement made by you or by Sergeant Alexander to the effect that you want to see the defendant?

"A Yes. As I recall, I requested that he bring the defendant to me and I would talk with him.

"Q And for what purpose?

"THE COURT: When you say '5:00 o'clock,' do you mean 5:00 p.m. [the time that Sergeant Alexander came to Lieutenant Barclay with this problem]?

"THE WITNESS: Yes, sir.

"THE COURT: Very Well."

[Resumption of questions by deputy district attorney]

"Q Could you please explain to us your purpose in asking Sergeant Alexander to bring the defendant to you at this time?

"A Well, my purpose at the time was to explain to the—Mr. White [defendant] the availability of the Public Defender's Office to represent him.

"I believe I explained to him that due to the hour of the day, that a Public Defender would not be available until 8:00 o'clock the following morning.

"Q Was there any further conversation along the lines of the defendant either himself or through some other person securing a private attorney?

"A I asked him if—oh, with regards to a private attorney—— I believe he said something to the effect that his mother might possibly contact or be able to provide an attorney later.

"But at that particular time he had no attorney in mind, and this is when I asked him if he wished the services of a Public Defender's Office.

"Q And what did the defendant say in this regard?

"A He stated that he would desire this.

"Q And was there some further conversation between you and the defendant or between Sergeant Alexander and the defendant in your presence?

"A Yes. I at that time informed him, as I stated previously, that it was possible to obtain the Public Defender for him. However, it wouldn't be until 8:00 o'clock the following morning.

"Q And did the defendant respond to this?

"A Yes. He was silent for a few moments. Then he said, 'Well, I don't want to wait that long. I'd like to get this done tonight,' or words to that effect, as I recall them.

"Q And did you make any reply to that?

"A I turned him back over to Sergeant Alexander at that time, as I recall."

ing. During this investigation, defendant made significant incriminating admissions. No attorney was provided defendant at this time, though defendant had been told that counsel would be available at that time. No one told defendant he could make a phone call either to an attorney or to his mother. (*People* v. *Johnson*, 70 Cal.2d 469, 474 [74 Cal.Rptr. 889, 450 P.2d 265].) Defendant's extrajudicial conversations with the police on the night of August 7 and on the morning of August 8 were admitted as evidence at the trial.

The facts of this case are directly in line with the case of *People* v. *Ireland*, 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580], where the court, in reversing the conviction, stated (pp. 535-536): "In the recent case of *People* v. *Fioritto* (1968) 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625], we emphasized that 'A principal objective of [the *Miranda*] decision was to establish safeguards that would liberate courts insofar as possible from the difficult and troublesome necessity of adjudicating in each case whether coercive influences, psychological or physical, had been employed to secure admissions or confessions.' (68 Cal.2d at p. 717.) We then went on to indicate that this objective imposed upon us a constitutional responsibility to insure that extrajudicial statements of criminal defendants not be admitted at trial unless the full range of 'protective devices' [footnote reference omitted] prescribed by *Miranda* was in operation at the time when such statements were obtained. [¶] One of the primary 'protective devices' envisioned by *Miranda* is that requiring that custodial interrogation wholly cease when the suspect indicates in any manner that he wishes to exercise his Fifth Amendment privilege. A suspect may indicate such a wish in many ways. He may, as in *Fioritto*, refuse to sign a waiver of his constitutional rights; he may simply refuse to continue an interrogation already in progress; or he may, as in the instant case, ask for an attorney. 'Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. *If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.*' (Italics added.) (*Miranda* v. *Arizona, supra,* 384 U.S. 436, 474 [16 L.Ed.2d 694, 723].) [¶] . . . Clearly defendant's request manifests a desire to have the assistance of his attorney at the earliest possible moment. This, under *Miranda,* is an assertion of the Fifth Amendment privilege—and therefore 'the interrogation must

cease until an attorney is present.' (384 U.S. at p. 474 [16 L.Ed.2d at p. 723].)''

It seems beyond question that under the circumstances here present there existed a psychological persuasion at the time defendant, on the evening of August 7, consented to make a statement in the absence of an attorney. And, while it is true that the trial court meticulously stated its disbelief of defendant's testimony as to why he agreed to make a statement, the intangible pressure condemned in *Miranda* remained. In *People* v. *Hamilton*, 268 Cal.App.2d 393-394 [74 Cal.Rptr. 29], the court considered the problem of a defendant first requesting an attorney and then agreeing to speak in the absence of such safeguard. There, the court stated: ''The officers took defendant to an interrogation room and placed him under arrest. Deputy Sipe advised defendant of his constitutional rights by reading from a printed card containing what was described as the standard *Miranda* formula (*Miranda* v. *Arizona*, *supra*). He was asked whether he understood those rights and whether, having them in mind, he wished to talk to the officers. Defendant replied that he understood his rights as enumerated, and that he wanted a lawyer.

''Deputy Sipe then advised defendant that since he requested a lawyer, the officers could not talk to him at all, that 'it just cut us off from having any conversation with him.' Officer Sipe correctly analyzed the situation, but he nevertheless told defendant that the officers were of the opinion 'that he had come to the Sheriff's Office to clear a Charles McGriff of the charges that was [*sic*] against him, and to admit some burglaries that were committed in the Oildale area.' Officer Sipe testified that defendant then said he would talk to them. Sipe reread the *Miranda* rights from the card; defendant again said he understood them and that he would talk to them. After interrogation, estimated variously between one and two hours, the officers obtained a confession from defendant. . . .

''Viewing the evidence most favorably to respondent, continued questioning by the officers after defendant told them he wanted an attorney runs afoul of *Miranda* as explicated in *Fioritto*. While it is true, as the Attorney General points out, the interrogation by Deputy Sipe after defendant announced he wanted an attorney was not directly accusatory, nevertheless the officer's leading and suggestive statements constituted psychological persuasion of the kind proscribed by the court in *Miranda*.

". . . [I]t is just such tactics that are condemned in the language of *Miranda,* at page 1627: 'Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.' In *Fioritto* the court gave .this language strict and literal interpretation, characterizing it as 'the didactic language of the United States Supreme Court,' and observed that such language 'shows no disposition to permit subsequent interrogation in the absence of counsel even if authorities believe there has been a change of circumstances.' (P.719).

"Since the officers continued to question defendant after he demanded an attorney, we are compelled, under the authority of *Miranda* and *Fioritto,* to hold the confession of defendant inadmissible."

In the present case, defendant made the request to have the assistance of counsel immediately prior to the interrogation. This is all that is required to put a halt to custodial interrogation.[2] The fact that defendant later agreed to be questioned by police does not negate his earlier assertion of his *Miranda* rights if his consent to be interrogated was upon the premise that no attorney would be made available to him for some 15 hours.

We also recognize that there is no requirement in *Miranda* which compels police officers to shut their ears or refuse to participate in general conversation *volunteered* by a defendant, but a fair reading of the record before us does not comport with the conclusion that the statements made by defendant were *volunteered.* The statements were given in the setting and form of an interrogation. As stated in *People* v. *Fioritto, supra,* 68 Cal.2d 714, 719: "We do not, of course,

---

[2] "Thus, while *Miranda* (*id.* at pp. 473-474 [16 L.Ed.2d at pp. 722-723]) dictates that if the individual states that he wants an attorney, the interrogation must cease until an attorney is present, the case draws a distinction between questions relating to a defendant's understanding of his rights or waiver of them, on the one hand, and *interrogation,* developing the facts under investigation, on the other.

"By definition, 'to interrogate' is 'to question typically with formality, command, and thoroughness for full information and circumstantial detail,' and 'interrogation' is 'the act of interrogating.' (Webster's Third New Int. Dictionary, p. 1182.)

"This appears from the direction given in *Miranda,* at page 485 [16 L.Ed.2d at p. 730], approving the F.B.I. practice set forth in a quoted letter: 'When the person who has been warned of his right to counsel decides that he wishes to consult with counsel before making a statement, the interview is terminated at that point. . . . If he is indecisive in his request for counsel, there may be some question on whether he did or did not waive counsel." (*People* v. *Smith,* 270 Cal.App.2d 715, 722-723 [76 Cal.Rptr. 53].)

disapprove of the use of statements, whether admissions or confessions, voluntarily initiated by a suspect. Such statements have been repeatedly sanctioned in the decisions of this court (see e.g., *People* v. *Jacobson* (1965) 63 Cal.2d 319, 328 [46 Cal.Rptr. 515, 405 P.2d 555]), and are also expressly authorized in the *Miranda* opinion.''

The protective statement elicited by the sergeant from defendant in his effort to make effective the waiver of presence of an attorney was not nearly as strong as that in *People* v. *Johnson, supra,* 70 Cal.2d 469, 474, where the declarations of waiver were held to be ineffective.

The defendant's extrajudicial statements were erroneously admitted. The weapons involved in the crimes were found as the result of those statements, and therefore should have been suppressed as evidence.

The judgment is reversed.

AISO, J.—I concur in the opinion of my brother Justice Stephens reversing the judgment below, except for his view that once a defendant in custody has asked for an attorney, the police under no circumstances whatsoever can resume interrogation despite a defendant's change of mind. In this respect, I concur with my brother Justice Reppy's concurring opinion, except for the portion which attributes ingenuousness to this contemporary 20-year-old, especially one who represents himself to be 22 years old when convenient for his own illegal purposes.

REPPY, J.—In concurring in reversal, I wish to add some particular observations. Although *Miranda*[1] says that if an arrestee "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning'' (pp. 444-445), it is not clear that this rules out any reconsideration at all by the arrestee of his own feelings and desires in light of an intervening circumstance no matter what it might be, and even if it might be the receipt of information from law enforcement of a necessary lapse of considerable time, 15 hours in the instant case, before an attorney can be present to assist him. The concern in *Miranda* is that there be no improper influence impelling the arrestee to make a statement involuntarily. (P. 461.) It is not felt that in every circumstance inability to

[1]*Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974].

arrange for requested counsel in a given time is such an improper influence; that it can never be accepted as a basis for retraction of an initial request to have counsel present at a proposed interrogation and for a waiver of the right.[2]

There are circumstances in the instant case which indicate that the purported delay factor should never have been considered as a valid premise for such a retraction and waiver; that the delay was not inevitable. Alternatively, if it is to be considered that the delay was unavoidable, it is believed that there were coercive elements additional to the in-custody setting and the substantial delay before the public defender could be present.[3]

With respect to the first point, it is felt that the police lieutenant did not have all the information he should have had to guide him in making a decision as to whether he would pursue, and that for this and probably other reasons, he did not adequately and reasonably pursue avenues which would have led to the securing of counsel for defendant within a fairly short time.

Defendant was arrested on a Monday at his residence. He was then 20 years old.[4] At that time Sergeant Alexander told his mother that he was in very serious trouble and that she had better get him an attorney. Sergeant Alexander brought defendant to Lieutenant Barclay after defendant had indicated that he wanted an attorney[5] at the interrogation which

[2] In *People* v. *Hamilton,* 268 Cal.App.2d 393 [74 Cal.Rptr. 29], the problem was not one of time lapse before requested counsel could be present. The officers, after defendant stated he wanted an attorney, in effect, continued to urge him to talk by calling to his attention that he (the defendant) had come there to clear another party and to admit some burglaries.

[3] *Miranda* v. *Arizona, supra,* characterizes the in-custody setting as a factor operating to overcome free choice (p. 457). However *Miranda* concedes that its coercive aspect is not so strong but that, despite it, there can be a voluntary waiver of rights. (Pp. 444, 470, 475.) Official representation that requested counsel cannot be obtained for a substantial period of time adds an element of pressure of some sort, especially with respect to an arrestee wanting to give a statement. As indicated, I am not prepared to say that a retraction of a request for counsel can never be considered freely made under this combination of factors.

[4] Information from a driver's license in possession of defendant gave his age as 22. However, it is not clear that either Sergeant Alexander or Lieutenant Barclay had digested this information and relied on it. Defendant admitted that his license so read, but was positive in his testimony that he was 20 at the time of his arrest. Unquestionably he so would have advised the officers if he had been asked.

[5] There was in this request no differentiation between a private attorney and one from the public defender's office. The sergeant had not specifically mentioned the public defender, although he had advised defendant he could have an attorney appointed if he had no funds.

the sergeant desired to carry out. The lieutenant asked defendant if he had a private attorney. Defendant replied that he did not have one in mind. His reply did not rule out the fact that his family or close friends would have had reasonably prompt access to a lawyer. Defendant said that his mother might get him one. The lieutenant did not ask defendant if he had access to funds. Defendant had stated that he did not think his mother had funds right now. This remark hardly closed the subject; rather it invited further inquiry. If such an inquiry had been made it would have revealed that defendant was the beneficiary of $2,500 from his deceased father's estate of which his mother had charge. Most attorneys would have been satisfied to rely on this source of funds and would have been willing to attend an interrogation session in this type of case without a substantial advance retainer or any at all. Lieutenant Barclay did not consider and did not ask defendant his age. If he had heard defendant's version of his age, he should have been and, no doubt, would have been more concerned about making contact with a private attorney through the mother. The record is silent as to whether Sergeant Alexander advised Lieutenant Barclay of his warning to defendant's mother that she should get an attorney for defendant.[6] If the lieutenant had this information, he might well have, and, of course, should have taken a different approach about contacting defendant's mother. He could have anticipated that she had been making efforts to get a lawyer.[7] If he acted without this knowledge, it is no excuse because the sergeant's knowledge is imputable to the police as an entity. As it was, Lieutenant Barclay (although he knew defendant desired an attorney)[8] did not call defendant's mother, nor have Sergeant Alexander call her (which would have been logical because he was the one who had become acquainted with and issued the warning to her) and advise her that he needed the legal services he had recommended right now. He did not indicate to defendant that he (defendant) could call her. He did not even advise defendant that he had the right to make a phone call.[9] Lieutenant Barclay testified that it had

---

[6] These circumstances bring the instant case close to that of *People* v. *Ireland*, 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580].

[7] In *Johnson*, *supra*, (p. 474) the knowledge of the officers that the defendant's wife and mother were endeavoring to get a lawyer for him was listed as a significant factor.

[8] This was stressed as significant in *Johnson*, *supra*.

[9] Compare *Johnson*, *supra*, wherein a telephone call to defendant's mother-in-law was allowed, but police failed to ask if the defendant

been his intention to call a private attorney if defendant had one in mind. He should have carried out his intention to the extent of calling or having the sergeant call defendant's mother.

Assuming, *arguendo*, that it was not unreasonable for the lieutenant to conclude that defendant was indigent and that the only telephone call to be made was to the public defender's office, it is noted that the time when Lieutenant Barclay presumably concluded that no call was to be made to bring about contact with private counsel was 5 p.m., or just a few minutes thereafter. There was introduced into evidence a bulletin from the chief of police saying that the services of the public defender were available between 9 a.m. and 5 p.m., and giving the telephone numbers to call during those hours and the names and extension numbers of three deputies, including the chief deputy. Since calls could be made up to 5 p.m., it is reasonable to conclude that under unusual circumstances the office would send out personnel after that hour. Despite the fact that it was just at or only a few minutes after the terminal hour, Lieutenant Barclay did not call the public defender. Reasonable consideration of the constitutional rights of defendant suggests that such a call should have been made. The lieutenant too readily accepted the nonavailability of the public defender as inevitable. This purported impossibility of obtaining the public defender until the next day should not have been put to defendant at the time and in the manner it was. With the time just at or only fractionally over the authorized limit, the police could not rationally ignore the request for a public defender.[10]

Enabling a defendant to obtain a lawyer when he requests one must be considered one of the procedural *safeguards* to secure the privilege against self-incrimination, the use of which must be demonstrated by the prosecution to make statements stemming from custodial interrogation admissible. (*Miranda* v. *Arizona, supra,* p. 444.) The showing of the People in the instant case fell short of such demonstration. "[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently [and freely] waived

wanted an attorney. Advising of the right to make a telephone call is not required as a separate item unconnected with a specific request for counsel; but it assumes more significant proportions in that framework.

[10]Compare the following language in *Miranda, supra* (at p. 472): ". . . the authorities cannot rationally ignore or deny . . . [an arrestee's] request [for counsel] on the basis that the individual does not have or cannot afford a retained attorney."

his privilege against self-incrimination and his right to . . . counsel [citations]." (*Miranda* v. *Arizona, supra,* p. 475.) The burden no doubt should be heavier where the right to counsel has been claimed once. The People did not meet their burden of showing that the purported retraction and waiver by defendant in this case was freely made in light of the fact that they were prompted by a factor which should have been avoided. Had either a private attorney or the public defender been contacted, it is probable that the wait would have been less than an hour (not much more at the most), which is far different from the 15 hours which defendant felt he had to wait. Defendant's decision to retract his request and to be interrogated without an attorney cannot be said to have been an informed change of mind.

In connection with the alternative point, firstly attention is called to the circumstance that the officers were dealing with a 20-year-old man who was not so alert and sophisticated as to post-arrest procedures and constitutional rights but that he failed initially to comprehend what was meant by giving up his rights.[11] Secondly it is noted that there was no rebuttal contradiction[12] by the officers of defendant's testimony (as there promptly was as to other parts of it) that when he was advised that an attorney from the public defender's office could not be present until 8 a.m. the next morning, he asked, "What else can I do?" and was advised, "Well, you know, you can help us out and make it easy on yourself." This, if a fact, was an additional coercive factor of the kind frequently faulted.[13] Defendant testified that he was told by the officers that he would not be booked until he gave a statement; that he was sleepy and that the officers kept waking him up. These claims were denied, in effect by the officers and were not

---

[11]"Question. All right. Do you understand your rights?
"Answer. Yes.
"Question. Do you wish to give up your rights and make a statement?
"Answer. I don't understand you."

[12]*Johnson, supra,* warns that "[it] is the duty of the reviewing court to examine the uncontradicted facts in order to determine independently whether a confession was voluntary" (p. 476); this duty apparently prevails even though the trial judge might not have believed the assertion despite it being uncontradicted.

[13]In *Johnson, supra,* the police stress was that no one would believe a denial of the offense and that it would show malice. (P. 478.) *Miranda, supra,* refers to the technique of conceding the right to counsel or to be silent but pointing out the incriminating aspect of exercising the right. (Pp. 453-454.) See footnote number 2 for what the police stress was in *Hamilton, supra.*

believed by the trial judge.[14] Defendant testified that he still wanted an attorney and did not realize, despite being asked if he had an attorney, that he could have one *then*. The trial judge could have disbelieved this also. However it is the difficult process of weighing such conflicting impressions and accounts as were given by the officers and defendant in the instant case from which the *Miranda* court believed the trial judge should be removed. As restated in *Ireland, supra,* 70 Cal.2d 522, and *People* v. *Fioritto,* 68 Cal.2d 714 [68 Cal. Rptr. 817, 441 P.2d 625], a principal objective of *Miranda* was to " ' . . . liberate courts . . . from the difficult and troublesome necessity of adjudicating in each case whether coercive influences' " (*People* v. *Ireland, supra,* at p. 535) had brought about admissions or confessions.

Finally, the lieutenant abruptly terminated his queries when defendant said that "he did not want to wait that long" and would "like to get this done tonight." He was quickly satisfied to accept the delay as the sole motive for defendant's change of mind. What followed was not a spontaneous stream of utterances (which might have been acceptable under *People* v. *Ireland, supra*) but a full-fledged interrogation intended to elicit incriminating answers; an interrogation typical of the accusatory stage; the type with which *Miranda* is concerned. "The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of . . . counsel, but whether he can be interrogated." (P. 478.)

---

[14]However, the denials by the lieutenant and the sergeant that defendant was told that he would not be booked until he gave a statement are cast into some doubt by the following excerpt from the sergeant's testimony:

"Q. Then you didn't intend to book him until after his statement was made?

"A. That's true."

Compare the unrebutted assertion in *Johnson, supra,* (at p. 476) that the police would not treat the defendant's body rash until his statement was completed.