[Crim. No. 21676. Second Dist., Div. Four. Dec. 18, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
FREDERICK JAMES WALKER, Defendant and Appellant.

## Counsel

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, William E. James, Assistant Attorney General, Howard J. Schwab and Lawrence P. Scherb II, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**JEFFERSON, Acting P. J.**—Defendant Frederick Walker was charged with a violation of Penal Code section 187, murder. After a jury trial, he was convicted of murder in the second degree. Probation was denied, and he was sentenced to state prison. He appeals.

The prosecution resulted from events occurring near San Luis Obispo on the evening of November 10, 1971. Witness Lawrence Mossor testified that he and his companion, the victim of the crime, Mario Amaya, had traveled south on that day from Carmel by hitchhiking. They had met the defendant on the road earlier in the day, and saw him again in the

afternoon near San Luis Obispo. The three men attempted to obtain a ride together to the south on Highway 101. Each man was carrying his possessions in a pack or bag.

About 4 p.m. the men decided they would not continue to try to obtain a ride. They hid their packs in some bushes near the Marsh Street exit off the highway. Mossor and Amaya walked to San Luis Obispo, a short distance away, to purchase wine, while the defendant stayed behind to guard their possessions. When they returned, the three men drank a half-gallon of wine and ate some food provided by Mossor. Another trip was made to town, and an additional half-gallon of wine was purchased and consumed by the three. They then decided to obtain some more wine. By this time all were feeling the effects of the wine to some degree, but no animosity had developed between them. It was now dark and Mossor and the defendant started for town, leaving Amaya at the campsite with the packs.

Mossor and Walker lost their way and started walking down the highway in the wrong direction. They were cited by a highway patrol officer for walking there. At this point, Mossor and the defendant Walker parted company. Shortly thereafter, witness Maiero was driving on the highway and saw the defendant get out of a truck near the Marsh Street exit. Maiero asked the defendant if he wanted a ride, but the defendant refused, telling him his pack had been stolen. Defendant then ran into the bushes by the road. When Maiero had followed him a short distance, he heard voices raised in argument and decided to call the police.

The police found the victim, Amaya, lying on the ground in the campsite with a severe neck wound which proved fatal. They also found the defendant at the scene, a few feet away. Further search of the area turned up a stained hunting knife which was identified as belonging to defendant. He was arrested and taken to the jail. (Mossor returned to the scene some time later, after receiving directions to the area from someone in San Luis Obispo.)

At the jail the defendant's stomach was pumped and his clothing examined. A sample of his blood was tested and showed an alcoholic content of between .10 and .12 percent. Defendant was examined by a doctor. None of the personnel in contact with him at the jail observed him to be intoxicated.

On the same evening, defendant was interviewed at the jail by Dr. Donald S. Patterson of Santa Barbara, a psychiatrist. At the onset of the interview Dr. Patterson advised the defendant of his constitutional rights

with respect to custodial interrogation.[1] According to the report of Dr. Patterson, "The subject indicated that he wished to be represented by an attorney, and that he did not wish to speak without such a person being present. Despite this, I proceeded with informing him of his constitutional rights, and when I reached the portion about the attorney, he again indicated that he wished to have an attorney and would be willing to have the Public Defender represent him. He generally maintained this stance throughout the interview time I spent with him, which was approximately one-half hour."

The defendant was represented by a public defender at his trial. Defendant testified on his own behalf that he was intoxicated when he and Mossor went to town to get the third bottle of wine. After he and Mossor parted company, he got the idea that Mossor and Amaya were planning to steal his back pack, an idea that agitated him considerably. He hopped a short ride on a truck back to the campsite. He went into the bushes to look for his pack; he did not remember seeing the victim, Amaya, or anything until he was taken into custody by the police officers. He testified that on several previous occasions he had had alcoholic blackouts; that he had a history of mental trouble; had attempted suicide; and was a failure in his relationships with others. Dr. Edgar Brichta, a psychiatrist, testified for the defense that in his opinion the defendant was a latent schizophrenic who, because of stress from various sources, was suffering from diminished capacity at the time of the crime.

The People then produced Dr. Patterson to rebut the defense of diminished capacity. He was allowed to testify over the strenuous objection of defense counsel that the defendant's *Miranda* rights had been violated. The trial court judge took the position that the defendant had "opened the door" to the psychiatric testimony of Dr. Patterson by asserting the defense of diminished capacity. He instructed Dr. Patterson not to relate to the jury any "incriminating" statements made to him by the defendant. Dr. Patterson related statements made to him by the defendant during the jailhouse interview. He testified that in his opinion the defendant was not a latent schizophrenic; that the defendant was capable of forming the required specific intent at the time of the crime, and that there was no

---

[1]He advised him of the rights set forth in *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], by the United States Supreme Court, which are: (1) the suspect must be informed of his right to remain silent; (2) there must be an explanation given of the fact that any statements he may make may be used against him; (3) he must be informed of his right to counsel, and (4) if he indicates that he wishes to remain silent, or wishes to consult an attorney, the interrogation must stop.

diminished capacity on the part of the defendant. His testimony was based on his interview with the defendant at the jail and upon other data collected about the defendant.

■ Defendant contends on this appeal that constitutional rights guaranteed to him by the Fifth and Fourteenth Amendments to the United States Constitution with respect to custodial interrogation were violated by the interview conducted at the jail by Dr. Patterson. We have concluded that this contention has merit. ■ The requirements of *Miranda*, cited *supra*, are specific in providing that interrogation must cease when a suspect indicates his unwillingness to proceed. A heavy burden falls upon the People to demonstrate that the defendant made a knowing and intelligent waiver of his privilege against self-incrimination and his right to consult with counsel. (*People* v. *Fioritto*, 68 Cal.2d 714 [68 Cal.Rptr. 817, 441 P.2d 625]; *People* v. *Ireland*, 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323]; *People* v. *White*, 275 Cal.App.2d 877 [80 Cal.Rptr. 461].) In *People* v. *Ireland, supra*, 70 Cal.2d at page 535, the California Supreme Court said: "One of the primary 'protective devices' envisioned by *Miranda* is that requiring that custodial interrogation wholly cease when the suspect indicates in any manner that he wishes to exercise his Fifth Amendment privilege. A suspect may indicate such a wish in many ways. He may, as in *Fioritto*, refuse to sign a waiver of his constitutional rights; he may simply refuse to continue an interrogation already in progress; or he may, as in the instant case, ask for an attorney. 'Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. *If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.*' (Italics added.) (*Miranda* v. *Arizona, supra*, 384 U.S. 436, 474 [16 L.Ed.2d 694, 723].)" ■ No showing of waiver was made in this case. We do not think the safeguards of *Miranda* can be met by taking time to advise a defendant of his constitutional rights, all the while engaging him in conversation with a view toward obtaining information in a manner clearly prohibited by *Miranda*.

■ Of course, *Miranda* applies only to custodial interrogation by a law enforcement officer, or an agent of such official, and does not apply to questioning by the laity. The People state that it is "arguable" whether or not Dr. Patterson was in fact an agent of the district attorney. There is no question but that he was. He testified that he was summoned by the district attorney on the evening of November 10, 1971; flew by plane from Santa Barbara to the San Luis Obispo jail the same evening for the

purpose of interrogating this defendant, which he did; and that his compensation for these activities came from the district attorney. He was therefore an agent of the state, and as such, could no more constitutionally disregard the defendant's rights and defendant's attempt to exercise them than could a police officer, or the district attorney. (*People* v. *Montgomery,* 235 Cal.App.2d 582 [45 Cal.Rptr. 475]; *People* v. *Polk,* 63 Cal.2d 443, 449 [47 Cal.Rptr. 1, 406 P.2d 641].)

In *Montgomery,* cited *supra,* the conviction of the defendant was reversed after the testimony of a neuropsychiatrist was admitted at trial, concerning the contents of an interview the psychiatrist had had with the defendant while in custody. The interview had been conducted by the psychiatrist at the request of the district attorney, and he interrogated the defendant "with a view toward being a possible witness for the prosecution." The court said, at page 590, "The fact that the neuropsychiatrist may intend to use the results of his interview as a basis for determining the mental condition of the accused does not remove it from a process of interrogation that lends itself to eliciting incriminating statements, nor shield it from the dangers against which the rule seeks to guard an accused."

■ It should be stated that a defendant who claims the defense of diminished capacity does not thereby necessarily "open the door" to testimony based on interrogation in violation of his constitutional rights. These rights are his because he is in custody; they control regardless of the nature of any possible defense. One is not required to give up some constitutional protections to avail oneself of others, including the right to present a defense to a criminal charge.[2]

The People argue that even if the admission of the Patterson testimony was error the defense was not substantially prejudiced since the trial court judge had instructed the doctor not to impart to the jury anything that the defendant had said to him during the jailhouse interview which would be incriminating. Violation of constitutional rights cannot be remedied in this way. The ruling placed upon the witness the duty to select which parts of his confrontation with the defendant were admissible, hardly the province of a witness, lay or expert. Furthermore, the necessarily piecemeal nature of testimony given on this basis might result in other dangers as well, in this situation: restricted cross-examination (the right to

---

[2] The possible exceptions to the general rule stated in the text, which were involved in *Harris* v. *New York,* 401 U.S. 222 [28 L.Ed.2d 1, 91 S.Ct. 643], and which were discussed at length in *People* v. *Taylor,* 8 Cal.3d 174 [104 Cal.Rptr. 350, 501 P.2d 918], do not arise on the record before us.

confront the witness) and the possibility that the jurors when it is obvious that there is a gap in the testimony, might well conclude, to the defendant's detriment, that incriminating matters were being withheld from them.

In our view, Dr. Patterson's testimony went directly to the heart of the defense, and we cannot say that his testimony had no prejudicial effect on the outcome of the trial; it seems very likely that it did contribute to the jury verdict of second degree murder.[3]

The defendant's conviction must be reversed for the violation of defendant's Fifth Amendment rights and for the violation of his Sixth Amendment rights, as well. The defendant did not have the opportunity to consult counsel prior to the interview with Dr. Patterson. (*Gideon* v. *Wainwright,* 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733]; *United States* v. *Wade,* 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926].) The lack of constitutional protection afforded the defendant in the instant case may be contrasted with the protection afforded him under California law when he has raised the defense of insanity and the court has appointed psychiatrists pursuant to Penal Code section 1027.[4]

The California Supreme Court has set forth requirements for the protection of defendants' right to legal counsel in connection with Penal Code section 1027 appointments, including that legal counsel be appointed *prior* to the examination of the defendant by a court-appointed psychiatrist, and that counsel be notified of the appointment, giving counsel an opportunity to consider with the defendant the positive and/or negative aspects of submitting to examination. (*In re Spencer,* 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33]; *People* v. *Price,* 63 Cal.2d 370 [46 Cal.Rptr. 775, 406 P.2d 55]; *People* v. *Nicolaus,* 65 Cal.2d 866 [56 Cal.Rptr. 635,

---

[3]See *Schantz* v. *Eyman* (9th Cir. 1969) 418 F.2d 11, where an Arizona county attorney had sent Dr. Bindelglas, a psychiatrist, to interview the defendant at his home. The defendant had been indicted for the murder of his wife, and had entered a plea of insanity. He refused to be interviewed. At trial, the People produced Dr. Bindelglas in rebuttal on the issue of insanity. The admission of his testimony resulted in the reversal of the defendant's conviction. The Ninth Circuit affirmed the reversal on the ground that there was a violation of the Sixth Amendment, the right to counsel; the court stated that the psychiatrist's account of his confrontation with the defendant (petitioner) substantially prejudiced him at trial.

[4]The defendant pleading insanity may refuse to be interviewed by a court-appointed psychiatrist; his voluntary submission to such an interview has been held a waiver of the privilege against self-incrimination. (*People* v. *Strong,* 114 Cal.App. 522 [300 P. 84]; *People* v. *French,* 12 Cal.2d 720 [87 P.2d 1014]; *People* v. *Combes,* 56 Cal.2d 135 [14 Cal.Rptr. 4, 363 P.2d 4]; *People* v. *Ditson,* 57 Cal.2d 415 [20 Cal. Rptr. 165, 369 P.2d 714]; 15 Stan.L.Rev. 538.)

423 P.2d 787].) Thus, had Dr. Patterson been appointed by the court to examine the defendant, his testimony would not have been admissible under the circumstances of this case. None of the safeguards were employed. There appears to be no justification for allowing inroads on constitutional protections by police psychiatrists that would not be allowed to those appointed by the court.

Defendant has presented other contentions on this appeal, but since we have concluded that his conviction must be reversed for the reasons herein stated, they will not be considered here.

Judgment is reversed.

Kingsley, J., and Dunn, J., concurred.

A petition for a rehearing was denied January 3, 1973, and respondent's petition for a hearing by the Supreme Court was denied February 14, 1973.